Nicholson, C. J.,
delivered the opinion of the Court.
Bichard Dove was tried and convicted of murder in the first degree, for killing William Diggins. The jury found that the murder was committed with mitigating circumstances, whereupon he was sentenced to the penitentiary for life. He has appealed to this court. The case was tried at the January Term, 1871, of the Crim *355 inal Court of Montgomery county, where the following evidence was adduced:
The first witness introduced by the State was Virginia Holland. Defendant objected to her examination on the ground that she was his wife, but refused to examine her on voir dire, and objected to her examination by the State to prove her competency. Defendant offered to prove by evidence aliunde, that she was his wife. The court gave leave to prove that fact. Defendant then offered to prove the marriage of the witness with defendant, by reputation, cohabitation, conduct, and acknowledgment of the parties; and tendered proof of that character, but the court refused to hear such proof, and ruled that a marriage could only be shown by the certificate of marriage, the testimony of the officer who performed the ceremony, or the evidence of witnesses who witnessed the performance of the ceremony. Defendant excepted to the ruling. Witness then proved that she had been living with defendant three or four years. They were living in a house in the coaling ground of Poplar Springs Furnace, in Montgomery, at the time of Wm. Diggins’ death, which took place in 1869. Dove was working for Diggins in the coaling grounds. Dove, witness, her two children, her mother, her sister, and Diggins, all lived in the same house, it having but one room. There were three beds in the room; witness and Dove occupied one, her mother and sister another, and Diggins and her oldest child, seven years old, the third. Dove and Diggins ate supper together; they were very friendly; there was no bad feeling between them; they laughed and talked together, *356 and then went to bed, and were so laughing and talking when witness went to sleep. About 2 o’clock at night, witness was awakened by the blows being struck by Dove with an axe, and by the cries of Diggins, who said: “Oh! Dick; oh! Dick.” Witness saw and heard Dove strike Diggins two or three blows with the axe. She jumped up and went to Diggins’ bed, saying, “Dick, you have killed my child!” She pulled the child from under Diggins., Dove said: “You see what I have done, and it is not the first 1 have done that way. I have done many a one that way.” He walked across the floor, and then said: “ Now if the old son-of-a-bitch has any money, I interrd to take it to travel on;” and took up Diggins’ pants, and took out his pocketbook and examined it, and said: “He’s got no money; here’s some scrip; I won’t have that; but I’ll take his knife;” and did put it in his pocket. He then threw a blanket over Diggins. Dove then asked witness what she was going to do; whether she was going with him. Sh,e replied she did not know; that she didn’t want to go with him. He then went out, and came in again with the axe in his hand and said: “Now say what you are going to do, and say it quick. I can’t leave you to witness against me. If you don’t go with me, I shall see the last of all of you. You sha’n’t be left for witnesses against me.” He then told witness’ mother to take Diggins’ chickens to the Furnace, about a mile and a half or two miles, and sell them, and collect a half dollar a negro owed him, and meet him at the Furnace that night at 12 o’clock. Witness, Dove, and her two children, then went off into *357 the woods; but; before leaving, Dove hid the ase under the sill of the house, where he said it could not be found. They stayed in the woods all day. Dove kept the knife in his hand, and said he would kill witness if she tried to leave him. Late in the evening they went towards the Furnace, and upon getting near the road, she saw Mr. Mathis and Mr. Brown, and she ran to them with her children, and asked for protection. She went on with them to the Furnace. Dove had lived with Diggins five or six months. She said Dove was once jealous of Diggins, but he had been satisfied about that. Diggins was an old gray headed man, about sixty years old. He was a quiet, good old man. She said Dove was a very passionate man; often got very mad without any cause; would be violent and irritable when no one had troubled him. Sometimes threatened witness and her mother, and had struck her without provocation. He frequently threatened to kill somebody; frequently said he would have the heart’s blood of somebody, walking the floor, in a great fury, throwing his arms wildly about, though nobody had done anything to him. His threats were not at anybody in particular. During one evening, while they were all sitting around the fire, he jumped up, gathered a chair, and tried to strike Diggins; but was ■ prevented by a young man present. There was no cause for this, no quarrel, nor was any warning given of his attack. He was not drunk, but had taken two or three drinks. He often complained of head-ache; he so complained during the day before Diggins’ death. To the question by the Attorney General, whether Dove, *358 from all she knew of him, was a man of sane or insane mind, answered: She never saw anything wrong about him; he was a very quiet man; a sullen and irritable man often, but talked like a man of sense.
Sarah Holland, the mother of the last witness, gave the same account of the transaction, and stated the character and peculiarities of Dove about as the last witness.
John W. Mathis proved that Dove was a lazy, trifling, indolent man; he was a strange man; nobody knew him; witness never knew him, though he had lived with him.
Sam. Tally, worked with Dove; he talked like any other man; he never had much to say; was very quiet. One day, when they were working, he suddenly stopped, and said, with an oath, “he would kill any man who would not work for himself, but made other people work for him.” He said Diggins did not work for himself, but made him work for him; that he would kill him before he would stand it any longer. This was some time before Diggins was killed. Diggins was not present, and they had no quarrel. He talked and acted like any other man.
The State introduced and read a paper purporting to be the return of a jury of inquest over Diggins’ body, over the objections of defendant.
Jefferson Sly, for defendant, had employed Dove to-work. He quit without cause; witness went to see him; complained of his head; acted strangely; walked the floor, and acted like a drunken man, but he had no whisky. While Dove worked for witness, he was very taciturn and gloomy; would sit by himself for *359 hours at a time; indulged in talking to himself a great deal; would mumble and sing to himself; complained often of pains in his head; wouldn’t work as long as he had anything in his house to eat. He was asked by defendant’s counsel what, from all he had stated, was the condition of his mind: was he of sound or unsound mind? The Attorney General objected to the question, and the objection was sustained by the Court.
James Andrews, T. J. Sly and Jeff. Wojoten, testified to similar characteristics of Dove as the last witness.
Patsey Cozzart, a sister of Dove, testified that he was 47 or 48 years of age; was born in Alabama; went to East Tennessee, and lived there until he was 13 or 14 years of age, when he came to Nashville. He was a clerk for Mr. Norman, in the grocery business, one or two years. While engaged with Mr. Norman, he received á bad wound on one side of his head; he was not expected to live. He was deranged from the wound. He talked silly and incoherently. He stayed with witness, while he was laboring under the wound, about four months. He then left, and returned to Mr. Norman’s. Pie was not then well; he was not much better. He complained of pains in the head all the time. He received the injury about fourteen or fifteen years ago. Before receiving the injury he was as smart, active and energetic as any man. She never saw him but once after he left, and that was twelve or fifteen years ago. She saw him but a few minutes; he said his head was not well.
The counsel for the defendant announced to the. Court, that he expected to examine several physicians, *360 as experts, on the subject of defendant’s sanity, but desired, before doing so, that the State might examine any further witnesses she might have on that subject. The Court ruled that the defendant must complete his testimony before the rebutting evidence of the State should be introduced. Defendant excepted to the ruling.
Dr. D. F. Wright testified, that he had been practicing as a physician and surgeon for twenty-seven years. He had examined the head of defendant, and found that he had received an injury to his head, apparently from a blow. It appears that there are two injuries to his head — one on the right side, just below the crown; the skull has been fractured, and a portion of the bone is depressed upon the brain. The depressed portion is fractured about the centre, and a piece of the skull bone is broken off, which protrudes through the fracture, and is now sticking down upon the brain. One of the injuries may have been the result, of concussion, resulting from the blow which caused the deju’ession. Without knowing anything of the previous history of the defendant, witness said such an injury was bound, more or less, to produce a diseased mind. Such an injury might produce disease of the mind that might lay dormant an indefinite length of time, or it might indicate its presence only in paroxysmal insanity. Its presence might only be detected by some startling crime, that would, for the first time, call attention to symptoms that only an experienced person could have noticed. Paroxysmal insanity would be the character of insanity most likely to result from such an injury. During the intervals between the paroxysms of one afflicted with that form of *361 insanity, tbe patient might appear reasonably rational, and might converse with intelligence. The symptoms of paroxysmal insanity are, moodiness, gloominess, melancholy, love of solitude, a feverish restlessness, irritability, passion without apparent cause. The persons afflicted often commit the most horrible crimes without any known cause, murders without motives discernible, and often upon those persons to whom they are most dearly attached, or those to whom they are indifferent. The patient is often overpowered by an impulse to commit murder, and yet is conscious of the crime he commits, and of the penalty incurred. lie may converse rationally about his crime, confess, or seek to conceal it. An effort to conceal the crime, or to escape, would not be evidence of sanity.
The counsel for defendant then submitted to the witness a written synopsis of the facts, as proven in the case, relative to the condition of defendant’s mind, and asked his medical opinion on the hypothetical case stated. He said the symptoms there stated were the precise symptoms of one laboring under paroxysmal insanity, and that he should say the strong probability was, that he was insane at the time of the commission of the crime; that, without personally knowing the facts and the defendant, he could not put it in stronger language.
Drs. T. T>. Johnson and J. M. Larkins were asked their opinions on the same hypothetical state of facts, and they fully concurred in the opinion given by Hr. Wright.
After charging the law correctly as to the several grades of homicide, the Circuit Judge proceeded to instruct the jury on the defense of insanity, as follows:
*362 “The law presumes a man to be sane, until the contrary is proven. ' The evidence of the insanity of defend-|nt must be as clear and satisfactory to overturn the presumption of the law in favor of sanity, as it is required to be, to overturn the presumption in favor of innocence. If the testimony leaves only a doubtful question, whether he was insane at the .time of the killing, the presumption of the law turns the scale in favor of the sanity of defendant. In such case the law holds the defendant responsible for his acts. If the evidence leaves it doubtful iu your minds, whether the defendant killed the deceased, then you should acquit; for there you find a reasonable ground for doubt, whether the defendant committed the homicide; and in such case, the testimony is not sufficient to overturn the presumption of innocence. But where it is admitted, or clearly proven, that the defendant committed the homicide, but it is insisted he was insane at the time he did it, and the evidence leaves the question of sanity in doubt, then you should find him guilty; for the other presumption arises, namely: that every man is presumed to be sane until the contrary is proven; or, in other words, where evidence of sanity on one side, and of insanity on- the other, leaves the question in an even balance, or so nearly poised that you have reasonable doubt of the insanity of the defendant, he is in that ease to be considered sane, and therefore responsible for his acts. The proof of insanity at the time of committing the homicide, ought to be as clear and satisfactory in order to acquit on the ground of insanity, as the proof of committing the act ought to be to find a sane man guilty.”
*363 Several errors have been assigned on the record in this case, which we will now proceed to examine:
1st. This cause was transferred from the Circuit Court of Montgomery county, to the Criminal Court of that county, under the provisions of the Act of 1870, e. 95, establishing a Criminal Court for Montgomery county. It is insisted that the transcript of the record from the Circuit to the Criminal Court, is not properly authenticated. It is certified by the Circuit Judge, and not the clerk of the Circuit Court. The tenth section of the act requires the Circuit Court to certify to the Criminal Court, transcripts of the entry and finding of all indictments and presentments now pending in the Circuit Court, which shall be transcribed upon the records and minutes of said Criminal Court, and said entry of record shall give to said Criminal Court full and complete jurisdiction of said criminal, matters. The third section requires the Circuit Court to transfer all bills of indictment and presentment to the Criminal Court, for trial and proceeding therein; and section four makes the clerk of the Circuit Court the clerk of the Criminal Court. After the transcript from the Circuit Court was entered upon the record and minutes of the Criminal Court, and after the bill of indictment was transferred to the Criminal Court, the defendant was arraigned upon the indictment, and put in his plea of not guilty. We do not doubt that a transcript, certified by the clerk of the court, or by the judge thereof, after its entry on the records of the Criminal Court, gave that court full jurisdiction of the case; and if any doubt had existed as to this, the objection ought to have been taken before pleading. But we think the Criminal Court *364 bad full jurisdiction of the case, and overrule this objection.
2d. It is insisted that, as tliere was a prosecutor marked on the indictment, it was error not to arrest tlie judgment. The indictment is marked, “no prosecutor necessary,” evidently because there was the return of the jury of inquest. But it is immaterial whether the return of the jury inquest was a valid or an invalid return. If the former, no prosecutor was necessary; if the latter, the omission to mark a prosecutor was cured by section 5242 of the Code.
3d. It is said the court erred in requiring the defendant to submit his hypothetical case to the medical experts, before the State’s rebutting evidence on this question of insanity was given to the jury. The court followed the usual practice of requiring the defendant to adduce all his evidence before the State should be called on to bring its rebutting evidence. If the defendant had applied to the court, affer the State had finished its rebutting proof, to examine the medical experts, with the additional evidence of the State before the jury, and the application had been refused, it would have been error. But no such application was made, nor was the defendant in any way damaged, as the State introduced no rebutting evidence which made it necessary to re-examine the medical experts.
4th. It is assigned in error, that the court refused to allow the defendant to show the incompetency of the witness, Virginia Holland, by proving her marriage with the defendaut by reputation, conduct and acknowledgment of the. parties. The refusal of the judge to hear the evi *365 dence tendered, must be understood as having special reference to the state of the question then before him. It was a question for the court, and not for the jury. The State had introduced a witness not bearing the name of the defendant. The defendant objected to her competency, alleging she was his wife. But he refused to examine her on her voir dire, and objected to her examination, as to her competency, by the State. The court allowed defendant to introduce proof of the marriage aliunde. He was bound then to produce the best evidence. This he did not do, or show any excuse for not doing. The court thereupon properly rejected the secondary evidence. It was manifest that the witness was not, in fact, the wife of the defendant. There was no error in this action of the court.
5th. It is insisted that it was error in the court to refuse to allow witnesses, to the question of sanity, to express .an opinion as to sanity of defendant, after having stated facts upon which their opinion was based. This question arose in the case of Gibson v. Gibson, 9 Yer., 329. Upon examination of the authorities, which were not found very satisfactory, the court laid down the following propositions: “First — -Attesting witnesses, and they only, are trusted to give their opinion merely, and without cause or reason assigned, of testator’s sanity. Second — Physicians may state their opinion of the soundness of a testator’s mind, but they must state the circumstances or symptoms from which they draw their conclusions. As to all others, their opinions, considered merely as opinions, are not evidence. But having stated the appearance, conduct or conversation of testator or other particular *366 fact from which his state of mind may be inferred, they are at liberty to state their inference, conclusion or opinion, as the result of those facts.” The court adds: “After all, it is the facts which a witness details, the conduct which he Rescribes, which chiefly and principally constitute the testimony to be relied on.” This question was again fully examined in the case of Norton v. Moore, 3 Head, 480, where the same rule was adopted. The rejection of the opinions of the witnesses, based upon the facts and circumstances stated by them, was erroneous.
6th. It is insisted that the judge trenched upon the province of the jury in charging them as follows: “But the plea of insanity is put in for the defendant. He admits that he killed the deceased, but says that his mind was so much diseased at the time of the killing that he was incapable of committing the crime of murder, he being insane.” The obvious meaning of the judge was, that the plea or defense of insanity was put in for the defendant, and not that the defendant had put in a formal plea of insanity to the indictment. The residue of the statement was evidently intended to instruct the jury, that, in relying upon the defense of insanity the killing was necessarily admitted. We can not well see how the jury could have been mislead, or how they could have misunderstood the true meaning and purport of this language. We, therefore, think, this assignment of error, is not well taken.
7th. The last and most important error assigned is, as to that portion of the charge already quoted, in which the judge, among other things, said: “The proof of insanity must be as clear and satisfactory, in order to acquit *367 on the ground of insanity, as the proof of the crime ought to be to find a sane man guilty.” The plain and unambiguous meaning of this language is, that the defense of insanity can not be available, unless it is proved beyond a reasonable doubt. In another portion of the charge, the judge says: “ That, if the evidence of sanity and of insanity be on an even balance, or so nearly an. equipoise that you have a reasonable doubt of the insanity of the defendant, he is in that case to be considered sane, and therefore, responsible for his acts.” It is conceded that this cause is sustained by English cases, and by cases in a few of the States, but it is certain that it is in contravention of a large number of decisions in other States of the Union.
We have had no case in our own State where the exact question involved in the present one has arisen; but we consider the principle which must govern the decision as having been laid down in the case of Coffee, Ridley & Short v. The State, 3 Yer., 283, and followed ever since in subsequent cases. These cases were determined in 1832, and separate opinions were given by Judges Catron, Green and Peck. The cases had been tried before Judges Stuart and Kennedy, of whom Judge Catron said: “They are gentlemen of decided talents, accurate and extensive information on the criminal law, and great experience.” They had charged the juries, “that the law presumed the defendant innocent, and that presumption stood until the fact of killing was clearly made out by proof; and if they entertained a reasonable doubt as to the fact of killing by the defendant, they should acquit him; but if the fact of killing by the defendant be proved, the law presumed *368 him guilty of murder, unless the proof showed clearly and satisfactorily the offense was one of less magnitude; and therefore, if they entertained doubts under the testimony, whether the act amounted to murder or manslaughter, they were bound to find defendant guilty of murder, as it lay upon the defendant to show clearly and beyond a •reasonable doubt, that the offense was not murder, but manslaughter, unless it appeared otherwise in the testimony of the State.” Judge Catron said: “The defendant is charged with the fact of killing and the intent with which it was done, and the fact and the intent, must concur to constitute the crime. The fact and intent are charged by the State, and must be proved to the conviction of the jury. But suppose they are not convinced that it is their duty to find the defendant not guilty; that is what is meant by a reasonable doubt.”
In such case, he says: “If, from this whole body of evidence, they are convinced of the killing, but are not convinced that it was done with malice, they ought not to find the defendant guilty of murder.” Judge Green said: “There is no reason in saying that a jury must acquit upon a doubt as to the fact of killing, and yet upon a stronger doubt as to the equally important fact of malice, they must convict. It is admitted that if this state of the mind (doubt) exist as to the fact of killing, an acquittal must follow. But not so as it relates to the malice. And why? Because we are told there is a legal presumption to afford the mind a resting place. In answer to that proposition, it has already been shown that this legal presumption, which was prima facie evidence of the fact, has been opposed by *369 evidence so tveakening its force as no longer to be satisfactory, and consequently a doubt as to the fact thus presumed, must now exist. I hold, therefore, that to warrant a verdict of guilty of murder— the whole evidence taken together — must generate full belief of the guilt of the party as .consisting in the killing with malice. Whether, therefore, the doubt exists as to the killing, or as to the evidence of malice in the perpetrator, it results in the same thing — that is, a doubt whether the accused be guilty of the crime of murder.” Judge Peck concurred in the reasoning, and conclusions of Judges Catron and Green. The charges of the Circuit Judges were overruled, and from that time to the present, the law has been settled in our State, that, if the proof fails to generate full conviction of every material ingredient constituting the' crime of murder, the defendant must be acquitted. \ But the question is now raised, whether this principle of law is applicable to a case where there is reasonable doubt of the sanity of the defendant? The Criminal Judge, it has been seen, adopts the same doctrine as to reasonable doubt in the matter of sanity that Judges Stewart and Kennedy did as to the presumption of malice from killing.
Is there any sound reason upon which it can be held that a doubt as to the malice in the killing shall operate as an acquittal, but that a doubt as to the sanity of the defendant at the time of the killing shall not so operate?
“If any person of sound memory and discretion, unlawfully kill any reasonable creature, in being, and *370 under the peace of the State, with malice aforethought, either express or implied, such person shall be guilty of murder”: Code 4597. "We have adopted the definition of murder given by Sir Edward Coke. The person to be guilty of murder must be of sound memory and discretion; “for,” as Blackstone says, “lunatics or infants are incapable of committing any crime, unless in such cases where they show a consciousness of doing wrong, and of course a discretion or discernment between good and evil.”
Assuming that this interpretation of the words “sound memory and discretion” is sufficiently accurate, it may be safely stated that no person can be guilty of murder who has not sufficient discretion or discernment to distinguish between good and evil, and who has no consciousness of doing wrong. The law presumes every person to have this sound memory and discretion. Therefore, when the defendant was put upon his trial for murder, it was not necessary for the State to adduce proof of bis sanity. The presumption of law stood for and supplied the proof.
If he relied on the defense of insanity, the burden of proof was upon him to show that he was not of sound memory and discretion, unless the proof of the State showed that he was not of sound memory and discretion. To warrant a conviction, it must appear that the accused was capable, at the time of the killing, of distinguishing between good and evil, and had a consciousness of doing wrong. If he was thus sane, he could act willfully, deliberately, maliciously and premeditatedly. "We have seen, that, to justify a conviction for murder in *371 the first degree, the State must show beyond a reasonable doubt that the killing was done willfully, deliberately, maliciously and premeditatedly. All these are essential ingredients in the offense, and all must be proved beyond reasonable doubt. But, suppose the proof in the cause makes it an even balance in the minds of the jury, whether the defendant was sane or insane. How, in that state of doubt, could the jury find that the defendant did the killing willfully, deliberately, maliciously and premeditatedly? They are in doubt about his being of sound memory and discretion. Of course they must doubt whether he could have done the killing willfully, deliberately, maliciously and premeditatedly. Yet, in the case before us, the judge instructed them that if the proof left their minds in equipoise as to the sanity or insanity of the defendant, the presumption of law turned the scale, and the defendant must be regarded as sane. The presumption of sanity stands for sufficient proof of sanity until the presumption is overturned. When the proof of insanity makes an equipoise the presumption of sanity is neutralized — it is overturned, it ceases to weigh, and the jury are in reasonable doubt. How, then, can a presumption, which has been neutralized by countervailing proof, be resorted to to turn the scale? The absurdity to which this doctrine leads will be more obvious by supposing that the jury should return a special verdict. It would be as follows: “We find the defendant guilty of the killing charged, but the proof leaves our minds in doubt whether he was of such soundness of memory and discretion to have done the killing willfully, deliberately, maliciously and *372 premeditated] y.v Upon such a verdict no judge could pronounce the judgment .of death upon the defendant.
It is impossible to read the evidence in this case and not feel shocked by the enormity and atrocity of the crime, if we assume that the defendant was -of sound memory and discretion. An old, quiet, inoffensive man is brutally cut to pieces with an axe while he is sleeping peacefully in the room with the defendant and his family. No provocation had been given, there was entire friendship and cordiality between them when they retired to bed. Yet the jury found that the murder was attended with mitigating circumstances, and the defendant was sentenced to hard labor for life in the penitentiary.
We have searched the record in (vain for any semblance of a single mitigating circumstance. We are forced to the conclusion that the jury doubted whether the defendant was sane, and being instructed by the court that such doubt would not justify an acquittal, they gave the defendant the benefit of this doubt as a mitigating circumstance by way of saving him from the gallows. It has been earnestly and ably pressed upon us in argument, that the doctrine charged by the Criminal Judge ought to be adopted from considerations of public policy. It is conceded that the doctrine ought not to be carried to the extent of subjecting defendant to capital punishment, about the soundness of whose memory and discretion the juries may have doubts. This, it is admitted, would be too shocking to humanity to be tolerated. But t is insisted that the peace of society, and the prevention of the repetition of such horrible tragedies by defendants *373 whose sanity is doubtful, would justify the courts in bolding that defendants who rely upon the defense of insanity should be required to establish their defense beyond reasonable doubt, otherwise that they should be held responsible as criminal, and subjected to' imprisonment for life.
The force of this argument is much strengthened by the facts proven as to the violent character of this defendant. To turn him loose might be to subject some other innocent victim to the same fate with Diggins. But this is not the tribunal to which the consideration of public policy, can be appropriately addressed.[1] Our business is to administer and not to make the law. We find the law well settled, that when the State charges a citizen with crime, his guilt must be established beyond reasonable doubt. We apply this rule to the worst men about whose sanity no doubt is raised, and turn them loose to repeat their crimes, because they are entitled to the benefit of the humane doctrine of doubts. With what show of reason or humanity could we reverse the rule as to that unfortunate class of citizens whose memory and discretion is found' to be of doubtful soundness, and subject them to imprisonment for life. If the law, as it now stands, furnishes no remedy for the protection of society against the danger of turning loose homicidal maniacs, it is time that the Legislature had provided a remedy. But it seems to *374 us that every society has the remedy within its reach. We do not see what obstacle is in the way of having all such cases tried by regular proceeding to ascertain the fact of insanity, and for the proper disposal of its unfortunate victims: Code 1553.[1] But Section 1654 of the Code provides specially that when the defense of present insanity is urged on the trial of a person charged with a crime which subjects him to imprisonment or death, it is the duty of the judge to submit the question of sanity to the jury as a preliminary question, and if the defendant is found to be insane, the judge orders him to the Lunatic Asylum. The facts of this case might well have induced the judge to follow the directions of this section of the Code.
Our duty is discharged in declaring that the defendant has been convicted and sentenced to imprisonment, for life contrary to law.
We reverse the judgment, and remand the case for a new trial.

 The argument that it was intended to urge, was, that the established law of England recognized this lule, and that policy forbade a departure from it — not that a new rule should be adopted upon such considerations now.

 The obstacle lies in the fact that the defense of present insanity is never put in when the fact of insanity at the time of the offense will answer the purpose.