C. M. Stuart *v.* The State.

## C. M. STUART *v.* THE STATE.

1. JUDGES OF THE VARIOUS COURTS. *May interchange. When. Sections 3,915, 3.916, 3,917 of the Code construed.* Although these sections do not, in express words, say that a Circuit Judge may interchange with the judge of a special Criminal Court, yet this is fully implied. They are judges of the State at large, and as such may exercise the duties of the office in any other circuit or district of the State. The word "judges" in Sec. 3,915 and previous sections of the same article, is not necessarily restricted in its meaning to Circuit Judges.

2. CRIMINAL LAW. *Homicide. Court need not define murder in first degree in charge to jury. When.* The Judge, in his charge, failed to define murder in the first degree; the reason for this was, that the prisoner had, on a former trial, been acquitted of this part of the charge, and could not again be tried for it. The Court, however, defined murder in the second degree. *Held,* the prisoner could not have been prejudiced by such failure, and there was no error.

3. SAME. *Same. Charge of Court upon question of unsoundness of mind, caused by mania a potu.* The prisoner was indicted for

C. M. Stuart *v.* The State.

murder; his defence was temporary insanity, caused by the use of intoxicating liquor, and known as "mania a potu," or "delirium tremens." The phrases mania a potu, delirium tremens, or similar terms, were not employed in the charge of the Court. The terms "unsoundness of mind," and "insanity" having been used. The instruction to the jury was, that such unsoundness of mind, or a reasonable doubt of the prisoner's sanity, whether the disease be permanent or temporary, caused by the voluntary use of ardent spirits, or otherwise, was sufficient to release the prisoner.

*Held,* It was not essential that the charge should have specially defined the various classes and types of insanity. It is the unsoundness of mind that excuses the act. According to the proof, mania a potu is a disease in which the mind is unsound. The language of the charge is sufficiently comprehensive to embrace the class of insanity in question. If the proof made out a case of mania a potu, it established a case of mental unsoundness. As to this part of the charge, there was no error.

Case cited: Dove *v.* The State, 3 Heisk., 370. Rogers *v.* The State, 2 Metcalf.

4. SAME. *Same. Prisoner must know right from wrong.* The charge of the Court was, in substance, that the accused must know that the act was wrong—that is, he must know and be conscious that this particular act was wrong; further, he must know the consequences, one being his punishment.

*Held,* The language of the Judge, though very brief, is quite comprehensive, and is as well adapted to the understanding of a jury as a more elaborate statement would have been, and is sufficient.

5. SAME. *Same. Evidence. Name of person slain.* There was no proof to show that the person slain was Agnes Stuart, the wife of the prisoner, as charged in the indictment, though the person slain was shown to be the prisoner's wife, Mrs. Stuart. There was no contest over the fact of killing, and the witnesses did not speak of the deceased as Agnes Stuart.

*Held,* This omission is of no consequence.

Cases cited: Joyce *v.* The State, 2 Swan.

6. SAME. *Same. Verdict of jury in criminal cases. What degree of weight entitled to.* The Court say: "The verdict of a jury is entitled to weight; it removes the presumption of the prisoner's innocence, and the superior advantages possessed by the jury

and Judge below, in seeing and hearing witnesses, and a full examination of the case, must be recognized. Making due allowance for this, however, shall we give the same effect to the verdict of a jury, by which a person is sentenced to death, that we would where it simply settles the title of a horse or a cow? Without hesitation we say no."

Case cited: Dains v. The State, 2 Hum.

FROM DAVIDSON.

Appeal from the Criminal Court. W. P. HICKER-SON, Judge, by interchange.

ATTORNEY-GENERAL HEISKELL for State.

M. M. BRIEN, Jr., and JOHN D. BRIEN, for Stuart.

McFARLAND, J., delivered the opinion of the Court.

The prisoner appeals from the judgment of the Criminal Court of Davidson County, rendered upon the verdict of a jury finding him guilty of murder in the second degree, upon an indictment charging him with the murder of his wife, Agnes Stuart. He was before this Court at a former term, upon a similar conviction; the judgment was reversed, and a new trial awarded for error in the Judge's charge.

Various errors are now assigned:

First, it is argued that Judge Hickerson, of the Sixth Circuit, was not authorized by law to interchange with Judge Frazier, of the Criminal Court of Davidson County. It appears that Judge Hickerson signed the bill of exceptions, and from this it is apparent he presided upon the trial, though the record does not show the fact that he was holding by interchange with

Judge Frazier. No question was made in the Court below, as to the power or jurisdiction of Judge Hickerson, and we think no such question could have been successfully made. By Section of the Code 3,915, "Judges and Chancellors are judges and chancellors for the State at large, and as such may, upon interchange, or other lawful ground, exercise the duties of office in any other judicial circuit in the State."

The word "judges" in this and the preceding sections of the same article, is not necessarily restricted in its meaning to Circuit Judges. Sec. 3,916 authorizes Circuit Judges to interchange, and 3,917 enacts that chancellors may also interchange with each other and with judges of the Circuit, Criminal or other special courts under the same circumstances and to the same extent.

Although these sections do not, in express words, say that a Circuit Judge may interchange with the Judge of a special Criminal Court, yet we think this is fairly implied. They are judges of the State at large, and as such may exercise the duties of the office in any other circuit or division of the State.

Various criticisms are made upon the charge given to the jury. 1st. Because the judge failed to define murder in the first degree. The reason for this was, that the prisoner had, on a former trial, been acquitted of this part of the charge, and could not again be tried for it. The charge, however, defined murder in the second degree, and, we think, with sufficient accuracy. We do not perceive how the prisoner could

have been prejudiced by the failure of the judge to charge the law in regard to murder in the first degree. He could not be put upon trial again for this grade of murder, and there would, perhaps, have been more reason for complaint upon the part of the prisoner, if the Judge had given the charge which it is now insisted he should have done.

The charge is also favorable to the prisoner, in giving the distinction between murder in the second degree and manslaughter. It is, however, manifest that the case did not turn upon this question. From the facts in proof, and the argument, it appears that the defense of the prisoner was rested alone upon the ground of temporary insanity, or mania a potu, at the time of the killing. And whether or not the proof made out this defense, or raised a reasonable doubt of the prisoner's sanity at the time, seems to have been the only controverted question of fact. It was upon this question that the judgment was reversed by this Court at the former term.

It is earnestly argued that the law applicable to this defense, was not properly submitted to the jury. The charge, in substance, was, that the law presumed the prisoner, if over 14 years of age, to be of sound mind, and the burthen was upon him to introduce proof to show his want of sanity, or to create a reasonable and well-founded doubt of his sanity, to entitle him to an acquittal. The Judge, in his charge, does not use the words *mania a potu, delerium tremens,* or other similar language, but uses the words "un-

soundness of mind," or insanity; the jury were instructed that to relieve the prisoner it was sufficient to show this unsoundness of mind, or create a reasonable doubt of the prisoner's sanity; and this was sufficient, whether the disease be permanent or temporary, and whether caused by the voluntary use of ardent spirits or otherwise. We do not think it essential that the Judge should have specially defined the various classes or types of insanity. It is the unsoundness of mind that excuses the act. According to the proof, *mania a potu* is a disease in which the mind is unsound. The language or the charge is comprehensive enough to embrace the particular class of insanity indicated by the proof. It says: The "unsoundness of mind may be temporary, caused by the use of ardent spirits." This is what physicians call *mania a potu,* or *delerium tremens,* and if the proof made out a case of mania a potu, it made out a case of mental unsoundness. We think in this there was no error.

The next objection is, that the jury were told that the prisoner must be regarded as of sound mind, if he knew the act was wrong, and knew the consequences; in other words, if he knew right from wrong.

Upon this question there is to be found a great deal of refinement and subtlety of reasoning. Upon mere abstract theory, there is scarcely to be found any such thing as absolute sanity.

It is seldom, if ever, a person can be found not subject to some peculiarity or obliquity of intellect, that may be, according to these abstract principles,

classed among some of the almost infinite forms of partial insanity. But this doctrine is altogether too refined to be applied in the practical administration of the criminal law.

We must have some standard more practical in its character. All persons possessing a "sound memory and discretion," in the language of our criminal code, should be held responsible for their criminal acts, and "a sound memory and discretion" must be understood in its practical and not in the abstract sense. Blackstone says: "Lunatics and infants are incapable of committing any crime, unless in such cases where they show a consciousness of doing wrong, and of course a discretion or discernment between good and evil." This language is quoted with approval in *Dore* v. *The State*, 3 Heisk., 370. In *Rogers* v. *The State*, 7 Metcalf, Chief Justice Shaw said: "A man is not to be excused from responsibility if he has capacity and reason sufficient to enable him to distinguish between right and wrong as to the particular act he is then doing—a knowledge and consciousness that the act he is doing is wrong and criminal, and will subject him to punishment. In order to be responsible he must have sufficient power and memory to recollect the relation in which he stands to others, and in which others stand to him; that the act he is doing is contrary to the plainest dictates of justice and right; injurious to others, and a violation of the dictates of duty. On the contrary, although he may be laboring under partial insanity, if he still understands the

nature and character of his act, and its consequences; if he has knowledge that it is wrong and criminal, and a mental power sufficient to apply that knowledge to his own case, and to know that if he does the act he will do wrong and receive punishment. Such partial insanity is not sufficient to exempt him from responsibility for criminal acts.

"If, then," (he continues, referring to the case then before him,) "it is proven to the satisfaction of the jury, that the mind of the accused was in a diseased and unsound state, the question will be whether the disease existed to so high a degree that for the time being it overwhelmed the reason, conscience and judgment; and whether the prisoner, committing the homicide, acted from an irresistible and uncontrollable impulse. If so, then it was not the act of a voluntary agent, but the involuntary act of the body without the concurrence of the mind directing it."

We quote this language in full, both because it is a clear and forcible statement of a sound rule, and also because it is the authority mainly relied upon by the prisoner's counsel.

The Circuit Judge, in the present case, was not so full and elaborate in his statement, but his language is very comprehensive. It will be seen from the opinion of Judge Shaw, above quoted, that the substance and essence of the rule he lays down is, that the accused must have capacity to enable him to distinguish between right and wrong in regard to the particular act—a consciousness that he was doing wrong,

and that he would be punished for it." Here the Circuit Judge said, in substance, the accused must know that the act was wrong. That is, he must know and be conscious that this particular act was wrong; further, that he must know the consequences. One of the consequences was his punishment. So the language of the Judge, though very brief, is comprehensive, and we think as well adapted to the comprehension and understanding of a jury, as a more elaborate statement would have been. The facts in proof upon the part of the defense do not tend to establish that the prisoner was laboring under any particular delusion, but simply that be was laboring under mania a potu, or delerium tremens.

There are other criticisms upon the charge, but we think this disposes of the vital question. We have considered the other questions, but do not think there is any material error.

It is next argued that the evidence does not sustain the finding of the jury. First, it is said there is no proof that the person slain was Agnes Stuart, the wife of the prisoner, as charged in the indictment. It very clearly appears that the person slain was the prisoner's wife, Mrs. Stuart. There was no contest over the fact of killing, and the witnesses do not speak of the deceased as Agnes Stuart; but this omission is of no consequence now, as was held in the case of *Joyce* v. *The State,* 2 Swan.

It but remains for us to examine the testimony

in the bill of exceptions to see if it be our duty to grant a new trial upon the facts.

The question has been argued by the Attorney-General as to how much weight or effect should be given to the verdict of the jury. It is maintained that the true rule originally was the same as in civil cases, that a new trial would not be granted unless the jury had acted with great rashness, and that in principle this is the sound doctrine.

If this rule ever did prevail, it has long since been abandoned in this State, and we have no disposition to return to it.

In *Davis* v. *The State*, 2 Hum., Judge Green said: "The rule that this Court will not grant a new trial upon the facts, unless the jury shall appear to have been guilty of great rashness, does not apply to criminal cases. In such cases new trials have been constantly granted by this Court upon its conviction that the verdict was not warranted by the proof." This rule has been uniformly followed ever since. The verdict of a jury is entitled to weight, it removes the presumption of the prisoner's innocence; we must, beyond doubt, recognize the superior advantages possessed by the jury and Judge below, in seeing and hearing the witnesses and a full examination of the case, and they can judge better of the credibility of witnesses; making due allowance for all this, however, shall we give the same effect to the verdict of a jury by which a person is sentenced to death that we

would where it simply settles the title to a horse or a cow? Without hesitation we say no.

A plaintiff in a civil case is only required to make out his case by a preponderance of proof; if he obtains a verdict and judgment in his favor, and the case comes to this Court upon a mere conflict between witnesses, this Court will not undertake to weigh and balance the testimony, to see upon which side the mere preponderance is.

But in a case involving the life or liberty of the citizen, we cannot escape the responsibility. We cannot, in law or in conscience, affirm a judgment, when, after making all due allowance for the superior advantages of a jury, we can yet see that the jury were not warranted upon the facts in finding him guilty.

We say this much in response to the argument on this question. And regarding it to be our duty to do so, we have carefully and earnestly examined the evidence in the bill of exceptions, and the result is that we are of opinion that the verdict is well sustained by the evidence, and the judgment must be affirmed.

The proof shows that for several years the prisoner was addicted to spells of intoxication, and exhibited on such occasions, both while drinking and afterwards, the usual symptoms, sometimes indicating mania a potu. It also appears the prisoner was intoxicated the night previous to the killing, but at the moment of the killing was not. But it is beyond question that at the moment his mind and disposition were affected by the previous night's debauch. But it does not follow

that on this account the jury should have pronounced him not guilty. Persons on such occasions, no doubt, do look wild and haggard, as the prisoner is described. The act was atrocious, and without provocation, but the record of crime will not permit us to say that some men will not commit such acts.

It is true that an experienced physician expresses an opinion upon a hypothetical case put to him by defendant's counsel, that the prisoner was, at the moment, of unsound mind, but the hypothetical case put to the witness was not a fair presentation of the case, for two reasons: First, the different occurrences or evidences of unsoundness, or mania, upon the part of the prisoner, happened many years apart, and were followed by long periods, when no such evidences were manifest. This was not fully developed in the hypothetical question; and, second, because, while the facts upon the part of the prisoner were presented with great force and ingenuity, the facts upon the part of the State, going to show the prisoner's sanity, were omitted altogether; and while the physician says he is of opinion that the prisoner was of unsound mind, he does not show to what extent.

Without setting out the evidence against the prisoner, it is sufficient to say that the jury were well warranted in finding that at the moment the prisoner was fully conscious of the nature of the act he was doing, his relation to the party, and the consequences that would follow, irritable and reckless as he may have been.

Several years have elapsed since the fatal tragedy, and the prisoner has doubtless suffered much, and may be entitled to sympathy, but after a patient examination of the case we must affirm the judgment.