## Bond *v.* State.*

### (*Nashville.*   December Term, 1913.)

1. **CRIMINAL LAW.  Admission of evidence.  Insanity.**

 Accused was charged with having obtained money in November, 1908, by false pretenses, and pleaded insanity as a defense. In November, 1909, a lunacy inquisition was held, and it was adjudged that accused was of unsound mind, and that he had been so since the spring of 1908; and on May 12, 1910, he was put to trial on his plea of present insanity, and the jury returned a verdict that he was then insane and incapable of defending the charge against him.  *Held*, that the lunacy proceedings and the verdict on the plea of present insanity were admissible in evidence.  (*Post, pp.* 83-85.)

2. **CRIMINAL LAW.  Responsibility.  Insanity.**

 Under a plea of insanity the question for determination is, whether accused had capacity and sufficient reason to enable him to distinguish between right and wrong as to the particular act, and a knowledge and consciousness that the act was wrong and criminal.  (*Post, pp.* 83-85.)

 Cases cited and approved:  Hughes v. Jones, 116 N. Y., 67; Davidson's Appeal, 170 Pa., 96; Hopson v. Boyd, 6 B. Mon. (Ky.), 296; Hutchinson v. Sandt, 4 Rawle (Pa.), 234; Christmas v. Mitchell, 38 N. C. 535.

3. **CRIMINAL LAW.: Evidence of insanity.**

 Evidence of insanity after the commission of the offense charged is competent to enable the jury to determine the state of accused's mind at the time the offense was committed. (*Post, p.* 85.)

4. **FALSE PRETENSES.  Prosecution.  Sufficiency of evidence.**

 In a prosecution for obtaining money from a national bank by

---

 *On the question of insanity after commission of criminal act, see note in 38 L. R. A. 577.  And for the method of raising insanity supervening after conviction, see note in 10 L. R. A. (N. S.) 1129.

Bond v. State.

false pretenses, evidence *held* to sustain a finding that the bank was at least a *de facto* corporation. *(Post, pp.* 86, 87.)

5. **FALSE PRETENSES.** Ownership of property. Proof of ownership.

It is sufficient to sustain a conviction for obtaining money by false pretenses from a corporation that the proof showed a *de facto* corporation. *(Post, pp.* 86, 87.)

Cases cited and distinguished: Trice v. State, 39 Tenn., 591; Jones v. State, 37 Tenn., 347; Owen v. State, 37 Tenn., 493.

6. **FALSE PRETENSES.** Possession of property. Sufficiency.

The possession, by persons assuming without authority to be a bank, of money left with them by depositors, would give them such a title as would support a prosecution for obtaining money by false pretenses, in fraudulently obtaining the money from them. *(Post, pp.* 87, 88.)

Cases cited and approved: State v. Misseo, 105 Tenn., 218.

---

FROM DAVIDSON.

Appeal from Criminal Court, Davidson County.— A. B. NEIL, Judge.

JOHN T. LELLYETT and EDWIN A. PRICE, for appellant.

F. M. THOMPSON, attorney general, and F. M. BASS, for the State.

MR. JUSTICE LANSDEN delivered the opinion of the Court.

The plaintiff in error, B. B. Bond, was indicted at the January term, 1909, in the criminal court of Davidson county, upon an indictment containing five counts, and he was convicted under the first count, which

charged in substance that he falsely pretended to R. E. Donnell, assistant cashier of the First National Bank of Nashvill,e Tenn., that he, the said B. B. Bond, doing business under the style and name of the Bond Produce Company, had on November 23, 1906, shipped and consigned from the city of Nashville, Tenn., to Griffin-Thomas-Payne Company, Boston, Mass., 200 cases of eggs via the Louisville & Nashville Railroad; that he then and there had in his possession the bill of lading covering said shipment, which had been regularly signed by G. F. Clark, agent at Nashville of said Louisville & Nashville Railroad Company; that the said B. B. Bond had drawn a draft on the said Griffin-Thomas-Payne Company, payable to the order of the Bond Produce Company, for the sum of $1,200, covering the said shipment, and requested said bank to advance said sum of $1,200 to him in cash, in consideration of which he indorsed and transferred to the bank the said draft with the bill of lading attached thereto; that the said B. B. Bond then and there exhibited to the said R. E. Donnell, assistant cashier, a draft as aforesaid, dated November 23, 1908, payable to and indorsed by the Bond Produce Company, and attached thereto was what purported to be, and what the said B. B. Bond falsely pretended was, a bill of lading of the Louisville & Nashville Railroad Company covering a shipment of eggs as aforesaid, which bill of lading purported to have been signed by G. F. Clark, agent of said railroad company.

The said R. E. Donnell, relying on the pretenses and representations aforesaid, and being deceived thereby, then and there advanced to the said B. B. Bond $1,200, and received in return the said draft and bill of lading indorsed as aforesaid. The said $1,200 was then and there placed on deposit in said bank to the credit of said B. B. Bond subject to his immediate check, and the said B. B. Bond thereafter checked and drew out of said bank the sum of $1,200. By means of said false, unlawful, and felonious pretenses the said B. B. Bond did obtain from the First National Bank $1,200, good and lawful money of the United States, property of the First National Bank, with the unlawful and felonious intent of defrauding said bank thereof; whereas, in truth and in fact, the said B. B. Bond had not on that day shipped or consigned any eggs to the Griffin-Thomas-Payne Company by way of said railroad company as aforesaid, and the said bill of lading had not been issued and signed by G. F. Clark, agent of said road, nor by any one authorized to do so. The said B. B. Bond then and there made such representations and pretenses, well knowing at the time that they were false, fraudulent, and felonious.

The defendant pleaded "not guilty" to the indictment, but interposed as his chief defense a plea of insanity at the time of the alleged false pretenses.

The case was tried September 24, 1913, and defendant was convicted as stated and sentenced to serve a

term of three years in the state penitentiary. Defendant has appealed and assigned errors.

It appears from the evidence that the defendant below has been engaged in the produce business at Nashville for a great many years and the principal part of his business has been in handling eggs. He had his banking connections with the First National Bank of Nashville for eighteen or twenty years of this time, and had an agreement with the bank by which the bank would advance money to him on drafts drawn on Eastern commission houses when there was attached to the draft a bill of lading issued by the railroad company covering a shipment of produce consigned to a particular house. It was the custom for the defendant to ship or consign a carload of eggs to an Eastern customer and receive from the railroad company a bill of lading covering the shipment, drawn to "order notify" such customer. The defendant would thereupon draw a draft in the name of and payable to the order of the Bond Produce Company for an amount sufficient to cover the value of the shipment, and attach to the draft the bill of lading received from the railroad company, and when this draft and bill of lading were presented to the bank the bank would advance to the defendant the amount of the draft, either by paying cash over the counter or by placing the amount of the draft to his credit subject to his immediate check. These transactions would be completed, so far as his dealing with the bank was concerned, when the defendant would pre-

sent the draft with a bill of lading attached to some officer of the bank, who would approve the transaction by marking "O. K." on the draft, and the defendant would then present the draft with the bill of lading attached to the teller of the bank, who would pay the cash or place the amount of the draft to defendant's credit. On November 23, 1908, the defendant presented a draft to the First National Bank, through its assistant cashier, R. E. Donnell, drawn by the Bond Produce Company on Griffin-Thomas-Payne Company, of Boston, Mass., for the sum of $1,200, payable to the order of, and indorsed by, the Bond Produce Company. Attached to this draft was what purported to be a bill of lading issued by the Louisville & Nashville Railroad Company, made out on one of its regular forms, and dated November 23, 1908, covering a shipment of 200 cases of eggs by the Bond Produce Company "to order notify Griffin-Thomas-Payne Company, Boston, Mass.," and signed "Louisville & Nashville Railroad Company, by G. F. Clark, Agent." This bill of lading was indorsed: "Bond Produce Company. B. B. Bond, Manager."

These papers were approved by the bank's officers, after proper examination, and according to the long-standing custom existing between the bank and the defendant the amount of the draft was placed to defendant's credit, and, within a short time, he drew the entire sum out of the bank upon his individual check.

The bill of lading was a forgery. No such amount of eggs was delivered to the railroad company by the

defendant, and the bank never received either the eggs or the amount of the draft from the supposed consignees, although demand was made for both.

This proof is made by the testimony of the assistant cashier, who says that the defendant presented the draft with bill of lading attached, indorsed as stated, and he approved it, believing the papers to be genuine. The cashier of the bank introduced the original deposit slip made out by the defendant, and identified it, together with checks drawn by defendant on the credits received from the deposit of the draft and the bill of lading as the original papers. The agent of the railroad company testified that the bill of lading was not signed by him, nor by anyone authorized to sign his name, and that the railroad company did not receive the consignment of eggs represented by the bill of lading.

A short time after this transaction with the bank, the defendant fled from Nashville to Hamilton, Ontario, Canada, and was there arrested. He had on his person, sewed up in his clothing, the sum of $6,186 in cash. Soon after the defendant was returned to Nashville from Canada he fell into a prolonged stupor, which lasted from about April 18, 1909, until about June 29, 1910, when he suffered a severe hemorrhage from the nose and kidneys, soon after which he regained consciousness. The evidence of his attending physician is in part as follows:

"Every time I saw him he was lying in bed on his back, and with his eyes shut, and simply breathing. Nothing I could say or do could make him show any manifestation of knowing I was there. I would open his eyelids and rub my finger on his ball, and he wouldn't even wink his eye, no more than rubbing it on the table. I would jab pins into him, jab them in his thigh, breast, and arms, and he wouldn't move any more than this chair. I can't see how he was feigning under those circumstances."

There is evidence of other witnesses introduced by defendant tending to show that, some months prior to the commission of the crime charged, the defendant's whole nature changed, so that he became irritable, fractious, and abusive to his family, whereas prior to that time he was aimable and agreeable with friends, and affectionate and indulgent with his family. The state offered proof to the contrary, indicating that, just prior to and on the day of the commission of the offense charged, the defendant was sane and of sound mind, and these witnesses give it as their opinions that he knew right from wrong, and could appreciate the quality of his act.

After the commission of the offense, and in November, 1909, an inquisition of lunacy was held concerning the defendant, and he was adjudged "a person of unsound mind, and that he has not capacity of mind sufficient for the government of himself or his property, and that he has been of unsound mind for the period since the spring of 1908."

It is also shown on the record that the defendant was put to trial May 12, 1910, upon his plea of present insanity, before the court and jury, and the jury returned a verdict that "the defendant is at present insane, and that it would endanger the peace of the community to set him at liberty, and that he is incapable of defending the charge against him."

Upon this verdict, the court committed the defendant to the superintendent of the hospital for the insane for the middle district of Tennessee; but on account of his physical condition the execution of the order of commitment was suspended until further orders of the court. No further order in respect of the defendant's custody seems to have been made. It appears that he remained at home under the care of his family until he was placed upon this trial in September, 1913. On the trial the defendant offered to introduce the lunacy proceedings and the plea of present insanity, together with the verdict and judgment of the court thereon, in support of his plea of insanity. Upon exceptions by the State, these documents were excluded, and the action of the trial judge thereon is assigned as error.

We think the exclusion of this evidence was error. The inquiry under the plea of insanity was whether the defendant had capacity and reason sufficient to enable him to distinguish between right and wrong as to the particular act he was then doing—a knowledge and consciousness that the act he was doing was wrong and criminal, and would subject him to punish-

ment. Evidence of his conduct and condition before, at the time of, and subsequent to the doing of the thing charged is admissible to enable the jury to arrive at a proper conclusion as to the defendant's mental *status* at the time he did the thing complained of. This is true generally as to statements and acts of the defendant. This rule would seem to include an inquisition upon reason, and there is much authority in support. Greenleaf on Evidence, vol. 2, sec. 371. Mr. Greenleaf says: "An inquisition taken under a commission of lunacy is admissible evidence, but not conclusive for the party's own favor." In support of the text, numerous English and American cases are cited. The rule is stated in substantially the same terms in 22 Cyc. 1133. In this authority it is said that an inquisition finding a person is insane at the time of the finding has been held to afford no evidence that he was insane at a previous time; but it is further said, if the inquisition overreaches an anterior period of time during which the person is found to have been insane, it raises a presumption of the existence of insanity during that period, which presumption, however, is not conclusive, but may be rebutted by evidence of sanity during the period overreached by the finding. The text is supported by *Hughes v. Jones,* 116 N. Y., 67, 22 N. E., 446, 5 L. R. A., 637, 15 Am. St. Rep., 386, in which many cases are cited to the same effect. See, also, *Davidson's Appeal,* 170 Pa., 96, 32 Atl., 561; *Hopson. v. Boyd,* 6 B. Mon. (Ky.), 296; *Yauger v. Skinner,* 14 N. J. Eq., 389; *Hutchinson v. Sandt,* 4

Rawle (Pa.), 234, 26 Am. Dec., 127; *Christmas v. Mitchell,* 38 N. C., 535.

The principal to be deduced from these authorities seems to be that, after an inquisition is regularly held on which it is found that the person is insane, the finding of. the inquisition is substituted for the legal presumption of sanity for the period of time covered by the inquiry and finding. In *Hughes v. Jones,* supra, the admissibility of the inquisition was admitted on the briefs of counsel, and it was conceded that the inquisition and findings "are *prima facie* evidence of 'the lunacy and incompetency of the party to contract from the time at which the inquisition finds the lunacy to have begun," and the court held that "contracts . . . made by this class of persons before office found, but within the period overreached by the finding of the jury, are not utterly void, although they are presumed to be so until capacity to contract is shown by satisfactory evidence."

To the same effect is Wigmore on Evidence, vol. 1, sec. 234; vol. 2, sec. 233; vol. 3, p., 2076.

Upon the foregoing authorities, we also think that the court should have admitted the verdict of the jury and the judgment of the court upon the defendant's plea of present insanity. This was a judicial declaration that the defendant was insane. It is true that it established his insanity at a period of time subsequent to the date of the alleged offense; but evidence of subsequent insanity is competent for the consideration of the jury in determining the state of the defendant's

mind at the time of the offense. Greenleaf on Evidence, supra.

It is also assigned as error that there is no proof of the corporate existence of the First National Bank of Nashville, Tenn. It is proven without exception by defendant that the defendant has been doing a banking business with the First National Bank for a period of eighteen or twenty years; that this bank had a cashier and assistant cashier, a teller and bookkeepers, who engaged in banking transactions with the defendant in the manner heretofore stated in this opinion. It is proven that the defendant presented the draft with the bill of lading attached, and received from the persons assuming to act as officers and employees of this bank $1,200 of good and lawful money of the United States. This, we think, establishes that the First National Bank is at least a *de facto* corporation, and such proof is sufficient to support a conviction. The absence of exception to the testimony showing the transactions of the bank with the defendant as a bank, and the claim of the officers of that bank that they were acting in their capacity as such, distinguishes this case from the case of *Trice v. State*, 2 Head, 591. The case is also distinguishable from the case of *Jones v. State*, 5 Sneed, 347, and *Owen v. State*, 5 Sneed, 493. The first of those cases was an indictment and conviction for passing a counterfeit bank note purporting to have been issued by the Iron Bank, Ironton, Ohio, and the second case was an indictment and conviction of fraudulently having in pos-

Bond v. State.

session a counterfeit bank note of the Bank of Tennessee and certain Kentucky banks. It was held in the *Jones Case* that the incorporation of the bank could not be shown by parol, but that its incorporation upon proper objection must be proven by the introduction of its charter. In the *Owen Case* the court took judicial knowledge of the charter of the Bank or Tennessee and its authority to issue notes. But as to the Kentucky banks it was held that the court could not take such judicial notice, and its *de jure* existence must be proven by the introduction of its charter. The reason of this holding is manifest. Only such banks as were especially authorized to do so could issue notes which would circulate as money, and before anyone could be convicted for counterfeiting, or having in possession counterfeit notes of such banks, the authority of the bank to issue notes under the law would have to be proven. The offense would necessarily depend upon the authority of the bank in law to issue the notes, because a counterfeit of an illegal or unauthorized note could not defraud anyone receiving it.

In this case, however, the principal ingredients of the offense are the fraudulent pretenses of defendant, by which the officers of the bank were deceived, and upon which he received money from the possession of the bank. The bank's possession of the money would support the conviction, whether it were legally authorized to do a banking business or not. If depositors or stockholders or other persons should leave money in the custody of those unauthorized but assum-

ing to be a bank, its possession thereof would be such a special title in the money as would make it larceny for anyone to steal and take it away, or to obtain its possession by false and fraudulent pretenses.   The gist of this offense is the fraud and deceit by which possession of the money was wrongfully obtained. *State v. Misseo,* 105 Tenn., 218, 58 S. W., 216.

Other errors assigned were disposed of orally.   For the errors indicated, the case will be reversed and remanded for a new trial.