TEMPLES *v.* STATE.

(*Nashville,* December Term, 1945.)

Opinion filed May 4, 1946.

WALTER M. HAYNES, of Winchester, for plaintiff in error.

NAT. TIPTON, Assistant Attorney-General, for the State.

MR. JUSTICE PREWITT delivered the opinion of the Court.

The plaintiff in error, J. D. Temples, hereinafter referred to as the defendant, was convicted of voluntary manslaughter on the person of Raymond O. Widener, with his maximum punishment fixed at seven years in the penitentiary.

There are but two questions raised by the assignments of error: (1) The sufficiency of the evidence, and (2) the failure of the trial judge to approve the verdict.

The defendant shot the deceased Widener with his pistol, firing two shots, which resulted in his death a few minutes later. The slaying took place immediately south of the passenger station at Cowan in Franklin County on Sunday afternoon about six o'clock on September 10, 1944. The train from Nashville to Chattanooga arrived at Cowan about 6 p. m. As the train was moving in the deceased and Mrs. Temples, wife of the defendant, came out of the station and started toward one of the passenger cars. The deceased was carrying Mrs. Temples' suitcase at the time. The defendant was standing close to one of the passenger cars, and as the deceased came by with Mrs. Temples, the defendant pulled his pistol, pointed it at Mrs. Temples, and a scuffle ensued. He then fired at the deceased, and as the latter was falling fired another shot into his body. When Mrs. Temples

scuffled with the defendant, Ed Keith, chief of police at Cowan, started to where they were, met the defendant and took his pistol away from him. There was evidence that the defendant, at the time he fired the shots, had a stare on his face and a very strange look. His defense is that he was emotionally insane at the time of the tragedy.

The proof shows that the defendant worked for the Nashville, Chattanooga and St. Louis Railway up to a short time before the killing, and the proof further shows that he was a man of excellent reputation. Defendant and Mrs. Temples were the father and mother of a nine-months-old child at the time of the shooting, and they were operating a hotel at Cowan. About two weeks before the killing the deceased went to the hotel operated by the Temples, took a room, and stayed there until he was killed. The deceased was a married man and lived with his wife at Nashville. Some several days before the tragedy, the deceased began to pay attention to the defendant's wife. He first came into where she was working in the dining room and sat down and talked with her. Later Mrs. Temples began to drink beer with the deceased. The defendant did not know deceased at that time, and he never saw his wife talking with deceased and had no knowledge of their intimacy until the day of the killing. Mrs. Temples fell in love with the deceased and saw him on several occasions during the week preceding the shooting.

On Friday before the Sunday that Widener was killed Mrs. Temples made a trip to Tullahoma in a truck to get a load of beer for the hotel. Widener met her on the road near a honky-tonk between Cowan and Winchester and got into the truck with her, this meeting having been previously arranged by them. The deceased

had some whisky with him and they drank it on this trip. They left early in the afternoon for Tullahoma and came back about nine o'clock that night. Widener, however, got out of the truck just before they reached town and Mrs. Temples drove on to the hotel alone. The defendant was at the hotel when she arrived that night. On this trip the deceased begged Mrs. Temples to leave the defendant and go away with him, stating that he would divorce his wife and she could divorce Temples and then they would get married. She at first refused and did not agree to do so. On the next day, Saturday, Widener went to Nashville, but he returned early Sunday morning, went to his room and went to sleep. Mrs. Temples awakened him about nine o'clock on Sunday morning. The defendant had already left when Widener came down into the dining room. The deceased brought a suitcase containing some wine and whisky back with him from Nashville. Mrs. Temples drank wine and deceased drank whisky during the day, and sometime during the day she agreed to leave with him.

The defendant, along with some friends, went fishing on Sunday and came back to the hotel about five-thirty in the afternoon. He drove up to the side of the hotel, got out and took his fishing tackle out of the car. He then carried part of his fishing tackle into the dining room. As he entered this room his wife was sitting behind the counter at the cash register and the deceased was sitting in front talking to her. As the defendant entered he said, "What do you say, folks," and his wife asked if he had caught any fish. He replied that he had caught four small ones, and then went back to the car to get the remaining part of his fishing tackle. He then went into the kitchen to clean the fish. About the time defendant got one fish cleaned, his wife walked up to

him and asked him to let her have the knife. Evidently he thought nothing of this and jokingly told her to get away, that he wanted to clean the fish and go to the picture show. His wife then grabbed him by the shoulders and spun him around, took the knife out of his hand, and said, "We want a divorce." The defendant answered, "We, who?" and then the deceased, whom Temples did not know at that time, said, "We do and don't start any rough stuff about it." Defendant then struck the deceased and ordered him out of the hotel, and finally shoved him out. Mrs. Temples' mother went out and called the chief of police, Ed Keith. Keith went into the hotel and asked what was the matter, and the defendant told him nothing. Defendant then took his nine-months-old baby from its grandmother, played with it, and gave it back to her and went on cleaning his fish. He went to the dining room to put his fish in the refrigerator and saw his wife and the deceased together in the dining room, and then speaking to Widener said, "I told you to get out of here and I mean for you to get out." Defendant came from behind the counter and Widener ran out of the front door. Defendant then went to his bedroom to change his clothes, and in a few minutes Mrs. Temples came in and told him that she was leaving with Widener and began packing her suitcase. Defendant undertook in vain to dissuade her. Defendant's wife then went into the hall and began talking to Widener again. Defendant testified that he heard his wife say to the deceased, "If he finds that gun, he'll kill you." Defendant went back into his bedroom, evidently looking for his pistol. He found his pistol but the cartridges had been removed. He finally found the cartridges in the bottom desk drawer, placed them in the pistol and put it in his pocket. When he came out of his bedroom Widener and his wife were

seated on a little porch immediately in front of the hotel, and he told Widener to leave his wife alone or he was going to get hurt. Widener then got up and went over to the depot. Mrs. Temples immediately went over to where Widener was standing near the depot and talked to him. They went into the station where there was a telephone and Widener went to the telephone. Mrs. Temples then came back and got her suitcase, and Widener met her about halfway in the middle of the street in front of the hotel and took her bag and they walked on into the sitting room. In a few minutes the six o'clock train from Nashville came in, and just before it stopped Temples walked up near it. After the train came in he saw the deceased and his wife coming out of the station, the deceased carrying his wife's suitcase and coat. As they passed him, deceased made a face at Temples, and he says that his mind became a perfect blank from that moment, and remained so until Ed Keith, chief of police, told him he had killed a man.

The above facts are undisputed. It is admitted that deceased Widener was unarmed at the time. The proof clearly shows that the deceased was taking Temples' wife from him and was going to leave with her on the train. It is further shown that on at least three occasions before the killing the defendant ordered Widener out of his hotel and pleaded with his wife not to leave with him. The undisputed facts in the case show the most brazen and outrageous conduct on both the part of Mrs. Temples and Widener toward the defendant.

The trial judge in overruling the motion for a new trial stated that he realized the defendant Temples was acting under great provocation, but felt like the case of *Drye* v. *State*, 181 Tenn. 637, 184 S. W. (2d) 10, was not as strong as the case at bar, and that the Supreme Court

had not dismissed that case but had only reversed it for a new trial, and therefore overruled the motion. He further stated that under the proof the defendant could not have been guilty of anything more than voluntary manslaughter. As before stated, the defense was one of temporary insanity.

In *Bond* v. *State,* 129 Tenn. 75, 165 S. W. 229, this Court held that under a plea of insanity the question for determination is, whether accused had capacity and sufficient reason to enable him to distinguish between right and wrong as to the particular act, and a knowledge and consciousness that the act was wrong and criminal.

In *Davis* v. *State,* 161 Tenn. 23, 28 S. W. (2d) 993, the Court held that an insane delusion does not excuse from crime in this state unless accompanied likewise by perceptional insanity. Irresistible impulse influenced by an insane delusion is therefore a defense not known to our law as long as the faculty remains to distinguish between right and wrong. The idea of an insane delusion, apart from the right and wrong test, has been definitely rejected in this state as a defense. The Court said at pages 33, 34 of 161 Tenn., at page 996 of 28 S. W. (2d):

"The general rule is that if a defendant has capacity and reason to enable him to distinguish the difference between right and wrong as to the particular act he is then doing, he is criminally responsible for such act. Some of our later cases are *McElroy* v. *State,* 146 Tenn. 442, 242 S. W. 883; *Watson* v. *State,* 133 Tenn. 198, 180 S. W. 168, and *Bond* v. *State,* 129 Tenn. 75, 165 S. W. 229.

"While the court fully appreciates the force of the reasoning of the courts accepting the doctrine of irresistible, impulse and the logic of the position from the standpoint of the psychiatrist, nevertheless, there are many grave objections to this doctrine in its practical

application, and it has been heretofore rejected by this court. The majority of the court think it wise to adhere to the right and wrong test as announced in *Johnson* v. *State, supra* (100 Tenn. 254, 45 S. W. 436).

.  .  .  .  .  .

''We are of opinion that if, as a matter of fact, the deceased had debauched the wife of plaintiff in error, and the plaintiff in error had been apprised of that fact and had become convinced of its truth on the day of the wedding or thereafter, and, with reasonable expedition, while under the influence of passion and agitation produced by such information, had killed Noe, he would only have been guilty of voluntary manslaughter. *Toler* v. *State,* 162 Tenn. 1, 260 S. W. 134.''

It was held in the *Toler Case* that it is not necessary to reduce killing to manslaughter that the passion be so great as to render defendant incapable of deliberation or premeditation; if circumstances are such as are calculated to produce such exitement and passion as would obscure the reason of an ordinary man, and induce him, under such excitement and passion, to strike the blow that causes death, this reduces the killing to manslaughter.

In the case now being considered by us the jury gave the defendant the benefit of lack of deliberation or premeditation, even though he had armed himself with a deadly weapon.

In the *Davis Case,* the defendant, in an insane delusion, killed one whom he thought had outraged his wife; in the *Toler Case,* the father slayed the despoiler of his daughter; and in the *Drye Case,* the husband slew his wife because of her repeated acts of infidelity. The underlying reasoning in all of our cases discussing this rule of temporary derangement is that the defendant is so

temporarily upset that his distinguishing ability has been marred and his reason dethroned. None of our cases go to the point of approving as a legal defense the taking of human life where the defendant was not acting in his necessary self-defense.

It is insisted, though, in this case that what happened was in the presence and hearing of the defendant; that within a few minutes he remonstrated with the deceased and told him that he must leave his wife alone; that the facts and circumstances are stronger than in our cases above discussed, in that this shocking conduct on the part of Mrs. Temples and the deceased, was in the very presence of the defendant; and further, that the deceased was taking Mrs. Temples away from her home and her infant child over the protest of the defendant; and that such a state of facts would justify the defendant in taking human life, if necessary, to prevent the departure of his wife with this home wrecker and libertine.

In view of the unusual circumstances of the instant case, it is not surprising that the trial judge stated that the defendant was acting under great provocation.

In *Curran v. State*, 157 Tenn. 7, 4 S. W. (2d) 957, the Court held that under our system the trial court is the forum in which the guilt or innocence of a defendant is primarily determined; and the presiding judge wields the scales of justice between the State and the defendant, and where, in his opinion, the defendant is not proved guilty, it is his duty to grant him a new trial. When the trial judge simply overrules a motion for a new trial presumably he approves the verdict, but such is not the case where he affirmatively states that he passes upon neither the guilt nor innocence of the defendant, and is glad that such responsibility does not rest upon him.

■ There is nothing to indicate that the trial judge did not approve the degree of homicide which the defendant was convicted of. We cannot construe his language to mean that he disapproved the verdict.

■ The defendant was accorded a fair trial and was represented by able counsel. Though the conduct of the deceased, in at least attempting to despoil the defendant's home, was revolting, yet this did not justify him under our law in taking the life of the deceased.

The judgment is affirmed, but the Court recommends that executive clemency be extended the defendant.