Clarence PHILLIPS, Petitioner-Appellant,

v.

William S. NEIL, Warden, Tennessee State Penitentiary, Respondent-Appellee.

No. 20970.

United States Court of Appeals, Sixth Circuit.

Dec. 7, 1971.

**338**

David E. Smith (Court appointed), Knoxville, Tenn., for appellant.

Bart Hurham, Asst. Atty. Gen., Nashville, Tenn., for appellee; David M. Pack, Atty. Gen., and Reporter, of counsel.

Before EDWARDS, PECK, and WILLIAM E. MILLER, Circuit Judges.

WILLIAM E. MILLER, Circuit Judge.

This is an appeal from the denial by the district court of appellant's petition for the writ of habeas corpus challenging his state court criminal conviction.

On February 18, 1969, Clarence Phillips was indicted by the Grand Jury of Campbell County, Tennessee, for the offense of first degree murder. He was charged with responsibility for the brutal slaying of Arthur Queener, which occurred on October 28, 1968. The jury returned a verdict of guilty and appellant was given a fifty year sentence. Having a history of periodic hospitalization in Eastern State Mental Hospital dating from 1965 through the date of the alleged offense, he raised, among others, the insanity defense. At the close of the evidence, he moved for a directed verdict. The motion was denied. A motion for a new trial was filed and also denied. Appellant, thereafter, exhausted his state appellate remedies.

The district court considered the points raised in the petition and ordered that the relief sought be denied. From this denial Phillips appeals.

The appeal is based on two contentions. First, the appellant argues that due process was denied him when the trial court did not sustain his objections to the prosecutor's reading of certain portions of his medical record in rebuttal to the insanity defense. These portions consisted of the reports of mental examinations made approximately one year prior to the alleged offense and contained, among other statements prejudicial to Phillips' case, the conclusion that the appellant had returned to Eastern State to avoid certain criminal charges. Second, he argues that due process was denied him by the introduction of a confession made to the local sheriff absent a determination of voluntariness. He makes this contention even though a timely objection was not made and his subsequent motion to strike was granted and the jury instructed to disregard the testimony.

[1] The district court held that appellant's second contention was without merit because of the absence of a timely objection and the granting of the motion to strike. The court further observed, in light of other substantial evidence, that the appellant committed the offense charged and that in any event the admission of the confession was harmless error. We agree with this conclusion. Thus the question before us on appeal pertains to the appellant's defense of insanity.

The first witness to testify regarding the mental condition of the appellant was Dr. Manuel Cortinas, psychiatrist at Eastern State Hospital at the time of the events in question. Dr. Cortinas testified first as to the circumstances under which he first interviewed Phillips (he had heard rumors that a young patient was talking of having beaten an old man to death) and as to statements made by Phillips at this interview which amounted to a confession to the offense. During direct examination of Dr. Cortinas by the prosecution, a copy of appellant's medical record at Eastern State was filed

in evidence as Exhibit 3. The transcript of the trial reveals that the defense counsel acquiesced in the filing of a, copy of the medical record rather than the original. No question at this point was raised regarding the admissibility of the record or any part of it under either Tennessee rules of evidence or federal constitutional standards. The colloquy which took place at this stage of the proceedings is set forth below.[1]

On cross-examination, counsel for appellant[2] questioned Dr. Cortinas extensively as to the appellant's mental state upon his return to Eastern State both generally and at the time of the slaying. He testified that the appellant, then his patient, suffered from paranoid schizophrenia. When pressed on the question of whether the appellant was "mentally responsible" for his actions, the doctor stated:

Well, to answer from a medical point of view—we are no judge—the patient, from a medical point of view, his judgment is impaired as to be responsible for his actions, I would say, and we consider him—I think anyone in psychiatry—that a psychotic patient— psychosis means deviation of judgment —and when a patient has a deviation of judgment, he doesn't know—I mean, really—I mean, his mind, in some way, we believe, from a medical point of view, that he is incompetent, from a medical point of view, and he is not able to make decisions, he doesn't know what he is doing about any responsibility. . . .

From a medical standpoint, he is incompetent; from a medical point of view, mentally, from a medical point of view, he is incompetent. Any psychotic patient is incompetent.

He was asked:

Is it true, Doctor, that this man, this defendant Phillips, the patient, in your opinion is not considered responsible for his actions, and that is why you consider him incompetent?.

Dr. Cortinas repsonded that this was true from a medical point of view. At no point in his testimony did Dr. Cortinas suggest in any way that the appellant had the capacity to distinguish right from wrong.

The second witness called upon to testify as to Mr. Phillips' mental state was Dr. Leyla Bozgoz, a medical doctor at Eastern State Hospital and a defense witness. Dr. Bozgoz was not a psychia-

---

1. The following colloquy took place at the time of the filing of the copy of the medical record:
Q. Do you have the record?
A. I do. At that time when the Court—
Q. Was this at another Court hearing, you are talking about?
MR. BROWN: Yes, He was a witness in the preliminary hearing, and had a record at that time.
THE WITNESS: This is the original of this; and this is the copy.
MR. BROWN: Your Honor, there is no objection on our part to substituting the copy for the original, as far as this record is concerned.
THE COURT: He has both the original and the copy. I will allow the filing of the copy, and allow you whatever time is necessary for you to compare it with the original.
MR. BROWN: If he says it is a correct copy, that is all I want.
Q. Is this a correct copy, the same as that?
A. It is the same; it is a copy, yes. It is a correct copy.
MR. BROWN: I will stipulate, your Honor, that it is a correct copy.
THE COURT: Well, now what does it consist of?
THE WITNESS: This is the whole record. This is the complete hospital record of the patient from the time of his first admission.
MR. BROWN: It goes all the way back to February, 1965.
THE WITNESS: It is a long record.
THE COURT: All right. This is filed as EXHIBIT 3. It is all together—I believe this is your subpena, Doctor. You may want to keep that.
(Exhibit 3, Eastern State Psychiatric Hospital record, Re: Clarence Phillips, ESPH #37-589, identified and filed.)

2. Appellant was represented by court-appointed counsel and no question is raised as to his competence or as to the quality of his legal services in appellant's behalf.

**340**

trist. When asked whether a schizophrenic with a psychotic condition would be able to tell right from wrong, Dr. Bozgoz gave contradictory testimony.[3] More important was the doctor's response to another question:

> Do you know the difference one way or the other whether the patient knew the difference between right and wrong when he escaped on September 30, 1968?

Dr. Bozgoz replied: "I have no idea, because he was not my patient."

The defense called five lay witnesses[4] who gave testimony pertaining to the appellant's mental condition: Tom Phillips, the grandfather of the appellant; Lucy Phillips, Tom Phillips' wife (the appellant often lived with the Phillips when he was not hospitalized); Louise Phillips, the appellant's aunt; Carl Harness, a neighbor who had worked with the appellant; and Dorothy Green, the appellant's mother. Each presented testimony which strongly suggested the appellant's mental incompetency, and each of the first three stated his or her opinion that the appellant was incapable of distinguishing right from wrong (Carl Harness and Dorothy Green were not

questioned specifically regarding the appellant's ability to tell right from wrong).

At the conclusion of the appellant's proof, the state offered rebuttal which consisted solely of the reading of certain portions of the appellant's lengthy medical record compiled at Eastern State, a copy of which had been filed as Exhibit 3 earlier in the trial. The portions of the record read were reports of mental examinations made on October 31, November 1, and November 2, 1967, almost exactly one year prior to the events in question. The defense objected strenuously, stating:

> It was treated as—not having to have the original, my position is that that particular part that he wants to read would just not be competent here, two reasons, the first place, Your Honor, it's dealing with an altogether different time, second reason is, we have no opportunity to cross-examine the man who made that notation.

The court overruled these objections, feeling that since both parties had agreed to the filing of the entire record neither should be precluded from making use of any part of it.[5]

---

3. The following took place on direct examination of Dr. Bozgoz by counsel for the appellant:

Q. Now this condition of schizophrenic reaction, with a psychotic condition, is a patient in that condition, in your opinion, responsible for his actions, medically, that is, does he know right from wrong? What is your opinion about this?
A. Yes, he should be. He ought to be able to tell right from wrong.
Q. If he is a schizophrenic with a psychotic condition he wouldn't be mentally responsible?
A. No, a psychotic would not be mentally responsible.
Q. If he was a psychotic, would he be calculated to know right from wrong?
A. No, sir.
Q. He would not?
A. No.

4. It is the rule in Tennessee that lay testimony that the defendant is insane is competent so long as the witness states facts upon which he bases his opinion.

Davis v. State, 161 Tenn. 23, 36, 28 S.W.2d 993 (1930). See also, Wheeler v. Parr, 3 Tenn.Civ.App. 374.

5. The following colloquy took place at this point in the proceedings:

ATTORNEY BROWN: We will object to this for two reasons,—
THE COURT: The Court may be mistaken, but I thought Exhibit 3 was introduced and filed as an Exhibit by agreement by both of you, that is The State and the Defendant.
ATTY. BROWN: It was treated as —not having to have the original, my position is that that particular part that he wants to read would just not be competent here, two reasons, the first place, Your Honor, its dealing with an altogether different time, second reason is, we have no opportunity to cross examine the man who made that notation.
THE COURT: Lets see what—
ATTY. BROWN: That is a statement in there by someone who is a total stranger to this thing.

Statements made in the challenged reports were the only evidence before the jury which suggested that the appellant might be responsible for his action. Since the guilty verdict represented a rejection of the insanity defense, it seems apparent that the jury relied on these reports and therefore that their introduction was highly prejudicial to the appellant.

It should be pointed out that the reports make clear neither the identity of the author nor his or her name. Furthermore, while not barren of factual data, the basis of the opinions stated in the reports is far from clear. For example, after setting forth dates of previous hospitalizations, the second report stated:

> Despite these possible psycho-neurotic developments demonstrated throughout the interview, or in psychological tests data, the patient was felt to be competent. It was the staff's opinion that the patient must be considered sane and able to communicate with his Attorney. However he may be unwilling to do so. This information was forwarded to The Court and a diagnosis

of no psychiatric disability was recommended.

Similarly, the first report stated the opinion that the appellant was capable of consulting with his attorney, and noted:

> . . . throughout the interview he demonstrated a callous lack of concern for his illegal actions stating repeatedly that he hoped being here would knock the charge.

And finally, the third report concluded:

> No evidence for psychosis is found in test data in this examiners opinion. Personality development is faulty; sexual identification seriously distorted; lower intellect and probably inadequate thorazine, 100 mg. TID, appeared to improve somewhat. Prognosis, guarded. Impairment, mild to moderate. Diagnosis, schizophrenic reaction, chronic undifferentiated type.

At the close of this rebuttal, the defense renewed its motion for a directed verdict and its objections to the prosecution's reading of the reports. These objections are set forth below.[6] The ap-

---

ATTY. GENL. CARSON: Three pages there Your Honor. Since the Defense has gone back into all these matters in '65, seeking to rely upon this evidence here on behalf of the Defendant, we should be permitted now in rebuttal to show anything that would be inconsistent with what has been shown.

THE COURT: I will permit you to read from Exhibit 3, either one of you, any portion that you may wish. My understanding was it was filed with the agreement of both parties.

ATTY. BROWN: It would be treated as an exhibit only as to such portions as would be admissible testimony as to a Defendant in a criminal case.

THE COURT: I will permit any of you to read any portion of it you wish.

ATTY. BROWN: Note our exceptions.

6. Defense counsel stated:

We would like very respectfully to save exception to The Courts ruling that this, particular portions of the transcript from the Eastern State Hospital could be read to the Jury, particularly for the reason that, reasons that, first

place, statements in there that were made by parties who were not produced here as witnesses. And was not presented by any witness who could be cross-examined about it, undertake to go into other crimes that this man was accused in this particular Court of making, apparently an examination conducted to see whether or not in 1967, he was of sufficient capacity to be able to inform his Counsel, go to trial in some other case. And for all those reasons, reading this into the record would be highly prejudicial to the Defendant. Further, when this record was filed as an Exhibit, never any intention, at least I had no understanding that by simply filing this thing so it would be available there for these doctors to refer to in their testimony and other parties who might have something in it, that it would be filed for the purpose of just reading any kind of report that might be in there from anybody was certainly beyond my conception, and I had no intention, frankly, of having ever asked it be filed for any such purpose as that. Just because its filed wouldn't mean that everything in it was competent. For those reasons we do very respectfully except

pellant's motion for a directed verdict was again denied; the court reiterated its view that since the medical records filed as Exhibit 3, had been admitted by agreement of the parties, the parties could properly make whatever use of them that they saw fit.

In Davis v. State, 161 Tenn. 23, 33, 34, 28 S.W.2d 993, 995 (1930), the Tennessee Supreme Court reviewed the test for the insanity defense in Tennessee:

> "The capacity to know right from wrong, and to know that the particular act being committed is wrong, is the rule recognized in this state for testing criminal accountability." Johnson v. State, *supra* [100 Tenn. 254, 45 S.W. 436].

> This is a definite holding that an insane delusion does not excuse from crime in Tennessee, unless accompanied likewise by perceptional insanity. Irresistible impulse influenced by an insane delusion is therefore a defense not known to our law, as long as the faculty remains to distinguish between right and wrong.

> The general rule is that if a defendant has capacity and reason to enable him to distinguish the difference between right and wrong as to the particular act he is then doing, he is criminally responsible for such act. Some of our later cases are McElroy v. State, 146 Tenn. 442, 242 S.W. 883; Watson v. State, 133 Tenn. 198, 180 S.W. 168, and Bond v. State, 129 Tenn. 75, 165 S.W. 229.

> \* \* \* \* \* \*

> The right and wrong test above mentioned was authoritatively laid down in McNaughten's Case, 1 C. & K., 130, 8 Eng.Reprint, 718.

See also, Temples v. State, 183 Tenn. 531, 194 S.W.2d 332 (1946) and Gibbs v. State, 192 Tenn. 529, 241 S.W.2d 556 (1951).

Applying this rule, Tennessee courts have held that once the defense has made out a prima facie case of insanity in the terms of the M'Naughton Rule the State must in order to overcome the defense offer evidence in rebuttal which demonstrates beyond a reasonable doubt the sanity of the defendant. Dove v. State, 50 Tenn. 348, 3 Heisk. 348 (1872); Stuart v. State, 60 Tenn. 178, 1 Baxt. 178 (1873); and King v. State, 91 Tenn. 617, 20 S.W. 169 (1892). See also, Jordan v. State, 124 Tenn. 81, 135 S.W. 327 (1910) and United States v. Horne, 304 F.Supp. 727 (D.C.1969).

In Garner v. Louisiana, 368 U.S. 157, 82 S.Ct. 248, 7 L.Ed.2d 207 (1961) the Supreme Court reversed criminal convictions for disturbing the peace when it found that

> . . . the convictions in these cases are so totally devoid of evidentiary support as to render them unconstitutional under the Due Process Clause of the Fourteenth Amendment. 368 U.S. at 163, 82 S.Ct. at 251.

See also, Thompson v. City of Louisville, 362 U.S. 199, 80 S.Ct. 624, 4 L.Ed.2d 654 (1960). It is our view after a careful review of the record that no evidence was introduced tending to cast substantial doubt on the prima facie case that the appellant was insane at the time of the slaying. More certainly, there was no evidence introduced demonstrating the defendant's sanity beyond a reasonable doubt. We choose not to rely on this ground, however, since we hold that the admission of the three challenged reports constituted a violation of appellant's Sixth Amendment right to confrontation and cross-examination.

In Pointer v. Texas, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1964), the Supreme Court held that "the Sixth Amendment's right of an accused to confront the witnesses against him is . . . a *fundamental right* and is made obliga-

---

to The Court's ruling in admitting that to the Jury.

We would also like at this point to renew the Motion which we made at the conclusion of the State's testimony

for a directed verdict, based upon the same reasons, as stated in the original motion, based upon insufficient evidence upon which a conviction could be based.

tory on the States by the Fourteenth Amendment." Emphasizing the importance of cross-examination in the fair adjudication of criminal matters the Court stated:

It cannot seriously be doubted at this late date that the right of cross-examination is included in the right of an accused in a criminal case to confront the witnesses against him. And probably no one, certainly no one experienced in the trial of lawsuits, would deny the value of cross-examination in exposing falsehood and bringing out the truth in the trial of a criminal case. 380 U.S. at 404, 85 S.Ct. at 1068.

The Court has made clear the importance of this right in our scheme of criminal justice on a number of occasions. For example, in Greene v. McElroy, 360 U.S. 474, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1964), the Supreme Court said of rights of confrontation and cross-examination:

They have ancient roots. They find expression in the Sixth Amendment which provides that in all criminal cases the accused shall enjoy the right "to be confronted with the witnesses against him." This Court has been zealous to protect these rights from erosion. 360 U.S. at 496–497, 79 S.Ct. at 1413.

And again in *Pointer*, it was said:

There are few subjects, perhaps, upon which this Court and other courts have been more nearly unanimous than in their expressions of belief that the right of confrontation and cross-examination is an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal. Indeed, we have expressly declared that to deprive an accused of the right to cross-examine the witnesses against him is a denial of the Fourteenth Amendment's guarantee of due process of law. 380 U.S. at 405, 85 S.Ct. at 1068.

Especially pertinent is Smith v. Illinois, 390 U.S. 129, 88 S.Ct. 748, 19 L.Ed. 2d 956 (1967), where the accused's Sixth Amendment rights were held to have been abridged when the trial court sustained the prosecutor's objections to disclosure on cross-examination of the correct name and address of the key witness for the prosecution. The Court stated:

In the present case there was not, to be sure, a complete denial of all right of cross-examination. But the petitioner was denied the right to ask the principal prosecution witness either his name or where he lived, although the witness admitted that the name he had first given was false. Yet when the credibility of a witness is in issue, the very starting point in "exposing falsehood and bringing out the truth" through cross-examination must necessarily be to ask the witness who he is and where he lives. The witness' name and address open countless avenues of in-court examination and out-of-court investigation. To forbid this most rudimentary inquiry at the threshold is effectively to emasculate the right of cross-examination itself. 390 U.S. at 131, 88 S.Ct. 748, 750, 19 L.Ed.2d 956 (footnote omitted).

■ The appellee asserts that the challenged evidence was properly admitted under the statutory exception to the hearsay rule embodied in section 24–714 of the Tennessee Code:

*Records as evidence.*—A record of an act, condition or event, shall, insofar as relevant, be competent evidence if the custodian or other qualified witness, testifies to its identity and the mode of its preparation, and if it was made in the regular course of business, at or near the time of the act, condition or event, and if, in the opinion of the court, the sources of information, method and time of preparation were such as to justify its admission. [Acts 1957, ch. 154, § 2.]

The admissibility of the challenged records under the statute was not adjudicated as the state courts focused upon the agreement of defense counsel to the filing of a copy of the entire hospital record in evidence and not upon the substantive requirements of the statute. It is like-

ly that Tennessee courts would find that hospital records fall within the general application of the statute. The great weight of judicial and scholarly authority supports such a holding.[7] Nevertheless, that proffered evidence is a business or hospital record does not alone dispose of the question of admissibility in a specific case.

In Neas v. Snapp, 221 Tenn. 325, 426 S.W.2d 498 (1968) the Tennessee Supreme Court held that evidence was improperly admitted under the above provision where a proper foundation was not laid for the introduction of an autopsy report into evidence. In so holding the Tennessee Court stated:

> Obviously, Mrs. Snapp was not the custodian of the report; nor could she qualify as an "other qualified witness" under the terms and provisions of the statute.
>
> Moreover, there is no evidence from which the trial judge could determine whether, "the sources of information, method and time of preparation" justified the admission of the report.

Accordingly, a proper foundation for the introduction of the autopsy report does not appear in the record.

Every report or other writing is not admissible simply because it was made or rendered in the conduct of some business or profession. A compliance with all the qualifications of the statute is a prerequisite to admissibility. 221 Tenn. at 330, 426 S.W.2d at 501.

It is in the requirements for laying of a foundation that the principles underpinning the exception will find expression.[8] Thus, in the instant criminal case, where the appellant was sentenced to fifty years, the hearsay evidence which may have been outcome-determinative was admitted with no judicial scrutiny of necessity or special reliability (under *either* state evidentiary or federal constitutional standards).

The relationship between the Sixth Amendment right to confrontation and cross-examination and the hearsay rule and its exceptions has not been fully explored. Some time ago Professor Wigmore asserted an identity between the

---

7. The admission of hospital records is discussed in some detail in McCormick, Charles T., Law of Evidence § 290, pp. 609–613. Also instructive is a comprehensive annotation found in 9 A.L.R. Fed. 457.

8. The principles underlying what Professor Wigmore would term legitimate exceptions to the hearsay rule are discussed extensively in 5 Wigmore on Evidence, Sections 1421, 2, and 3, pp. 202–4. Professor Wigmore stated, discussing the two principles which he found to underpin legitimate exceptions to the hearsay rule—circumstantial probability of trustworthiness and a necessity:

> Principle of the Exceptions to the Hearsay Rule. The purpose and reason of the Hearsay rule is the key to the Exceptions to it.
>
> The theory of the Hearsay rule (*ante* § 1362) is that the many possible sources of inaccuracy and untrustworthiness which may lie underneath the bare untested assertion of a witness can best be brought to light and exposed, if they exist, by the test of cross-examination. But this test or security may in a given instance be superfluous; it may be sufficiently clear, in that instance, that the statement offered is free enough from the risk of inaccuracy and untrustworthiness, so that the test of cross-examination would be a work of supererogation. Moreover, the test may be impossible of employment—for example, by reason of the death of the declarant—so that, if his testimony is to be used at all, there is a necessity for taking it in the untested shape.
>
> \*   \*   \*   \*   \*
>
> A perception of these two principles and their combined value has been responsible for most of the Hearsay exceptions. Each exception, to be sure, has come into existence and been maintained independently and amid considerations peculiar to itself alone. There has been no comprehensive carrying-out of a system of principles. Yet the results may be coordinated under those two heads. There has rarely been any judicial summing-up of the principles; yet their existence has been fully perceived and often judicially stated.

two, stating, seemingly without qualification:

> The rule sanctioned by the constitution is the Hearsay rule as to cross-examination, with all the exceptions that may be legitimately found, developed, or created therein. 5 Wigmore on Evidence, section 1397, p. 131.

In two recent cases, Dutton v. Evans, 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970) and California v. Green, 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1969), the Supreme Court, while refusing to set forth a theory "that would determine the validity of all such hearsay 'exceptions'" (399 U.S. at 162, 90 S.Ct. at 1937), provided guidance regarding proper application of the Confrontation Clause. In both cases the Court expressly rejected the notion of congruency. In Dutton v. Evans, *supra*, Mr. Justice Stewart stated:

> It seems apparent that the Sixth Amendment's Confrontation Clause and the evidentiary hearsay rule stem from the same roots. But this Court has never equated the two, and we decline to do so now. 400 U.S. at 86, 91 S.Ct. at 218.

And in California v. Green, *supra*, Mr. Justice White stated:

> While it may readily be conceded that hearsay rules and the Confrontation Clause are generally designed to protect similar values, it is quite a different thing to suggest that the overlap is complete and that the Confrontation Clause is nothing more or less than a codification of the rules of hearsay and their exceptions as they existed historically at common law. Our decisions have never established such a congruence; indeed, we have more than once found a violation of confrontation values even though the statements in issue were admitted under an arguably recognized hearsay exception. See Barber v. Page, 390 U.S. 719 [88 S.Ct. 1318, 20 L.Ed.2d 255] (1968); Pointer v. Texas, 380 U.S. 400 [85 S.Ct. 1065, 13 L.Ed.2d 923] (1965). The converse is equally true: merely because evidence is admitted in violation of a long-established hearsay rule does not lead to the automatic conclusion that confrontation rights have been denied. 399 U.S. 155, 156, 90 S.Ct. 1933.

Thus, it is abundantly clear that proper admission of evidence under an exception to the hearsay rule does not relieve a federal court considering a state criminal conviction from the responsibility for reviewing all the facts of the case in light of governing federal constitutional principles. Furthermore, fundamental constitutional rights may find protection both in procedural safeguards and in substantive rules. Standards of due process are not necessarily embodied in state evidentiary rules. For example, as we shall see below, while the colloquy which took place when the medical records were filed as Exhibit 3 might arguably have constituted a waiver of a hearsay objection under Tennessee law, it in no way constitutes a valid waiver of a "fundamental right" guaranteed in both state and federal criminal prosecutions. Thus, that the reports may have been validly admitted under Tennessee rules of evidence does not dispose of the question whether their admission constituted a violation of the appellant's Sixth Amendment rights.

It is well to review briefly the rulings in Dutton v. Evans, *supra*, and California v. Green, *supra,* as they make plain the view of a majority of the Court concerning the proper role and application of the right to confrontation and cross-examination. In the *Evans* case, the Court reversed the Fifth Circuit's holding that a Georgia statutory co-conspiracy exception to the hearsay rule violated the Sixth Amendment. The challenged evidence involved the testimony of a witness Shaw who stated that an alleged co-conspirator Williams had said to him upon Williams' return to the penitentiary:

> If it hadn't been for that dirty son-of-a-bitch Alex Evans, we wouldn't be in this now. 400 U.S. at 77, 91 S.Ct. at 214.

Holding that no abridgment of the Sixth Amendment guarantee had occurred, the Court pointed to what it termed "indicia of reliability," stating:

> The confrontation issue arises because the jury was being invited to infer that Williams had implicitly identified Evans as the perpetrator of the murder when he blamed Evans for his predicament. But we conclude that there was no denial of the right of confrontation as to this question of identity. First, the statement contained no express assertion about past fact, and consequently it carried on its face a warning to the jury against giving the statement undue weight. Second, Williams' personal knowledge of the identity and role of the other participants in the triple murder is abundantly established by Truett's testimony and by Williams' prior conviction. It is inconceivable that cross-examination could have shown that Williams was not in a position to know whether or not Evans was involved in the murder. Third, the possibility that Williams' statement was founded on faulty recollection is remote in the extreme. Fourth, the circumstances under which Williams made the statement were such as to give reason to suppose that Williams did not misrepresent Evans' involvement in the crime. These circumstances go beyond a showing that Williams had no apparent reason to lie to Shaw. His statement was spontaneous, and it was against his penal interest to make it. These are indicia of reliability which have been widely viewed as determinative of whether a statement may be placed before the jury though there is no confrontation of the declarant.

> *The decisions of this Court make it clear that the mission of the Confrontation Clause is to advance a practical concern for the accuracy of the truth determining process in criminal trials by assuring that "the trier of fact [has] a satisfactory basis for evaluating the truth of the prior statement."* California v. Green, 399 U.S., at 161 [90 S.Ct. 1930, at 1936]. Evans exercised, and exercised effectively, his right to confrontation on the factual question whether Shaw had actually heard Williams make the statement Shaw related. And the possibility that cross-examination of Williams could conceivably have shown the jury that the statement, though made, might have been unreliable was wholly unreal. 400 U.S. at 88, 89, 91 S.Ct. at 219 (emphasis added).

In California v. Green, *supra*, the Supreme Court reversed the California Supreme Court's holding that "prior statements of a witness that were not subject to cross-examination when originally made, could not be introduced . . . to prove the charges against a defendant without violating the defendant's right of confrontation guaranteed by the Sixth Amendment." The Court relied primarily on the availability of the declarant for cross-examination at the trial itself. Disclaiming any intention of elaborating a theory of the Confrontation Clause, Mr. Justice White stated:

> We have no occasion in the present case to map out a theory of the Confrontation Clause that would determine the validity of all such hearsay "exceptions" permitting the introduction of an absent declarant's statements. For where the declarant is not absent, but is present to testify and to submit to cross-examination, our cases, if anything, support the conclusion that the admission of his out-of-court statements does not create a confrontation problem. 399 U.S. at 162, 90 S.Ct. at 1937.

Significantly, the Court characterized, by way of contrast with the facts before it, the type of case in which the right to confrontation is most likely to be found to have been abridged:

> Finally, we note that none of our decisions interpreting the Confrontation Clause requires excluding the out-of-court statements of a witness who is available and testifying at trial. The concern of most of our cases has been focused on precisely the opposite

situation—situations where statements have been admitted in the absence of the declarant and without any chance to cross-examine him at trial. These situations have arisen through application of a number of traditional "exceptions" to the hearsay rule, which permit the introduction of evidence despite the absence of the declarant usually on the theory that the evidence posesses other indicia of "reliability" and is incapable of being admitted, despite good-faith efforts of the State, in any way that will secure confrontation with the declarant. Such exceptions, dispensing altogether with the literal right to "confrontation" and cross-examination, have been subjected on several occasions to careful scrutiny by this Court. 399 U.S. 161, 162, 90 S.Ct. 1936.

Similarly, it is well to recall the statement of the Supreme Court made nearly three-quarters of a century before when the Court articulated the nature of its concern in such matters. The Court stated:

The primary object of the constitutional provision in question was to prevent depositions or *ex parte* affidavits, such as were sometimes admitted in civil cases, being used against the prisoner in lieu of a personal examination and cross-examination of the witness in which the accused has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief. Mattox v. United States, 156 U.S. 237, 242–243, 15 S.Ct. 337, 39 L.Ed. 409 (1895).

■ In the instant case, as pointed out, the challenged reports appear to have been outcome-determinative. At no point did the appellant have the opportunity to confront their author. We consider this to be precisely the sort of case which deserved the "careful scru-

tiny" spoken of in *Green*. It is plain that we have before us a classic illustration of the efficacy of the Sixth Amendment guarantee of the right to confrontation and cross-examination.

■ It should be pointed out that the record contains no suggestion as to why the state chose to rely on hearsay evidence as rebuttal, instead of calling the authors of the reports to testify. The Supreme Court has made plain that death or other unavailability of important witnesses may justify exception to the right to cross-examination in certain circumstances. And, indeed, there may be other reasons why it might be desirable to deny a defendant the right to cross-examination. Absent a suggestion to the contrary, we may surmise that the chief value of the introduction of the reports in this case lay squarely in the fact that cross-examination was made impossible.

Neither the identity nor the qualifications of the authors of the reports was available to the jury. The importance of such factors is illustrated by the holding in Smith v. Illinois, *supra*, where denial of cross-examination as to the real name and address of the key prosecution witness constituted a Sixth Amendment violation.

Further, the most damaging portions of the reports consist of opinions and conclusions which are stated without a detailed explication of either the facts or reasoning processes on which they are based. The danger which inheres in the introduction of records containing psychiatric diagnoses has been pointed out in at least two rulings which dealt not with the right to confrontation, but with the admissibility of such evidence under business records acts somewhat like the Tennessee statute. In New York Life Ins. Co. v. Taylor, 79 U.S.App.D.C. 66, 147 F.2d 297, 304, 305 (1945) the court stated:

It is no reflection upon the profession of psychiatry to say that it necessarily deals in a field of conjecture. Even in the diagnosis of actual insanity, cases are rare in which trained psychiatric witnesses do not come to

opposite conclusions. The opinions here relate to neurosis, a condition short of insanity, on which there are countless theories and infinite diagnostic possibilities. It is difficult to conceive of records in which the right of cross-examination is more important than the conjectures of a psychiatrist on a psychoneurotic condition.

The drastic impairment of the right of cross-examination resulting from the admission of this type of unsworn observation and opinion evidence will be recognized by anyone familiar with the psychology of a jury trial. The unsworn psychiatric diagnosis would be introduced, with appropriate fanfare as to the distinguished character of the alienist who made it, but who is not called as a witness. The opposing party might have plenty of data to shake this testimony on cross-examination, yet he would have to remain silent while a strong prima facie case is made against him. The risk of perjury would be neatly avoided because the real witness is not sworn.

It is true that after the party who introduced such opinions has closed his case the opposing party would have a chance to rebut them. But the disadvantageous position in which the denial of his right of cross-examination would place him is obvious to any trial lawyer. A period of time has gone by; an impression on the jury has been made. The expensive and sometimes impossible burden of hunting out and producing the psychiatrist who gave the opinion is unjustly shifted to the party against whom the opinion is used. And after he catches and produces the psychiatrist he must offer him as his own witness—a disadvantage only slightly limited by the fact that the trial court may in its discretion allow him to impeach his own witness. Only a lawyer without trial experience would suggest that the limited right to impeach one's own witness is the equivalent of that right to immediate cross-examination which has always been regarded as the greatest safeguard of American trial procedure. 147 F.2d at 304 and 305. See also, Lyles v. United States, 103 U.S. App.D.C. 22, 254 F.2d 725 (1957).

That the reports were made approximately one year prior to the alleged offense further underscores the potential prejudice which inhered in their evidentiary use without cross-examination. While historical information is not irrelevant to a determination as to the mental state of an accused at the time of an alleged offense, there is the danger that not seen in the proper perspective, a jury will distort its worth. In the instant case, for example, the jury obviously relied on the conclusions of the challenged reports rather than those of Dr. Cortinas in reaching its verdict. These were conclusions which the authors of the report might well have rejected or modified in light of the facts which Dr. Cortinas ascertained immediately after the crime.

■ Thus, in the instant case, where no showing was made of special need to dispense with the appellant's right of confrontation, we find not the "indicia of reliability" discovered in *Evans* but rather factors which indicate a distortion of the "truth-determining process." In Evans v. Dutton, *supra*, the Supreme Court made clear that the mission of the Confrontation Clause is the protection of the integrity of this process. We hold, therefore, that the introduction into evidence of the reports in question constituted a denial of the appellant Phillips' right to confrontation and cross-examination guaranteed by the Sixth Amendment.

We turn now to the question of waiver. While not speaking specifically in terms of waiver of constitutional rights, the appellee, the court below, and the state courts make the agreement of trial counsel to the filing of the medical records as Exhibit 3 the focus of their analysis of this case. We find that trial counsel's acquiescence did not constitute a valid waiver of the appellant's fundamental constitutional right to confrontation with

regard to the crucial evidence here in question.

In Brookhart v. Janis, 384 U.S. 1, 86 S.Ct. 1245, 16 L.Ed.2d 314 (1965), a case which also involved the Sixth Amendment right to confrontation, the Supreme Court made clear the nature of the standard and the process of review appropriate in examination of asserted waiver of such constitutional rights. The Court stated:

> The question of a waiver of a federally guaranteed constitutional right is, of course, a federal question controlled by federal law. There is a presumption against the waiver of constitutional rights, see, e. g., Glasser v. United States, 315 U.S. 60, 70–71 [62 S.Ct. 457, 464–465, 86 L.Ed. 680], and for a waiver to be effective it must be clearly established that there was "an intentional relinquishment or abandonment of a known right or privilege." Johnson v. Zerbst, 304 U.S. 458, 464 [58 S.Ct. 1019, 1023, 82 L.Ed. 1461].

> In deciding the federal question of waiver raised here we must, of course, look to the facts which allegedly support the waiver. 384 U.S. at 4, 86 S. Ct. 1245, 1247.

Emphasizing the importance of the question involved, the Court said:

> In this Court respondent admits that:
> "[I]f there was here a denial of cross-examination without waiver, it would be constitutional error of the first magnitude and no amount of showing of want of prejudice would cure it."

> This concession is properly made. 384 U.S. at 3, 86 S.Ct. at 1246.

■ Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938) and subsequent cases relying on it [see e. g. Glasser v. United States, 315 U.S. 60, 70–71, 62 S.Ct. 457, 86 L.Ed. 680 (1941); Brookhart v. Janis, *supra*; and Boykin v. Alabama, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969)]; have made plain the duty of a trial court to ascertain beyond doubt that waiver of a fundamental constitutional right is "intentional" and "intelligent." For waiver to be valid, it must be plain from the record that the accused understands the nature of the right waived and knowingly assents to its waiver.

■ The appellant Phillips did not so waive his Sixth Amendment right to confrontation. The challenged evidence was filed in evidence as part of an extensive medical record. The colloquy which took place at that point in the proceedings reveals no hint that appellant's counsel, much less the appellant himself, had any intention of waiving the right to cross-examination as to any evidence containing opinions and conclusions regarding the pivotal question of his mental condition.[9] Furthermore, the strenuous and repeated objections of trial counsel upon his realization of what portions of the medical record the prosecution intended to read indicate that he had not "intelligently" intended to waive the right of cross-examination or other legitimate objection to such evidence.[10]

Even assuming that the medical record was allowed merely to be filed by defense counsel through some trial stratagem which went awry, we could hardly hold that such constituted a valid waiver of appellant's Sixth Amendment right of confrontation.

Accordingly, the decision of the district court is reversed and remanded with direction for entry of judgment granting the writ discharging the appellant from custody unless he is retried within a reasonable time.

9. See footnote 1.

10. See footnotes 5 and 6.